# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Romano*, 2012 IL App (2d) 091339

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF DANIEL ROMANO, Petitioner-Appellee and Cross-Appellant, and CYNTHIA ROMANO, Respondent-Appellant and Cross-Appellee. |
| District & No. | Second District<br>Docket Nos. 2-09-1339, 2-10-0100 cons. |
| Filed | March 21, 2012 |
| Rehearing denied | April 26, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the judgment dissolving the parties' marriage, the appellate court rejected respondent's contentions that the trial court misclassified certain assets, failed to consider over $6 million in "missing funds," and improperly rejected her claim of dissipation and her claim that petitioner committed a fraud on her marital rights, but the trial court's award of maintenance in the amount of $15,000 per month was vacated and the cause was remanded for a determination of the proper amounts of maintenance and child support, since the trial court's letter of opinion stating that upon reconsideration, respondent would be awarded $15,000 per month as maintenance and zero dollars for child support contravened petitioner's statutory right to modify child support. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 06-D-1161; the Hon. Rodney W. Equi, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

| Counsel on Appeal | Paul J. Bargiel, of Paul J. Bargiel, P.C., of Chicago, for appellant. |
| | |
| | Barry A. Schatz, of Berger Schatz, of Chicago, for appellee. |
| | |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. |
| | Presiding Justice Jorgensen and Justice Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1     Respondent, Cynthia Romano, appeals from the judgment of the circuit court of Du Page County dissolving her marriage to petitioner, Daniel Romano. Daniel has cross-appealed from the same judgment. Cynthia argues: (1) the trial court misclassified assets used to fund three trusts established by Daniel; (2) the trial court erred in classifying as nonmarital Daniel's interests in two limited liability companies; (3) the trial court failed to consider $6,429,000 in "missing funds" in its judgment; (4) the trial court's ruling with respect to dissipation is against the manifest weight of the evidence; and (5) the trial court erred in rejecting her claim that the transfer of certain assets into the trusts established by Daniel, as well as the subsequent transfer of the assets out of the trusts, constituted a fraud on Cynthia's marital rights. Daniel contends: (1) the trial court's division of marital assets was inequitable; (2) the trial court improperly substituted a maintenance award for a child-support award; (3) the trial court's maintenance award was improper; and (4) the trial court erred by failing to account for the predistribution of marital assets to Cynthia for attorney fees. We affirm in part, vacate in part, and remand.

¶ 2                                         I. BACKGROUND

¶ 3     A substantial amount of evidence was presented to the trial court in this contentious dissolution action. Accordingly, we initially set forth only information sufficient to frame the issues raised by the parties in their appeals. Additional relevant facts will be presented in the analysis of the issues to which they pertain.

¶ 4     Daniel and Cynthia were married on June 12, 1987. Daniel filed a petition for dissolution of marriage on May 23, 2006.[1] Cynthia filed a counterpetition for dissolution of marriage on June 26, 2006. On October 16, 2007, Cynthia filed a "Notice of Claim of Dissipations." A trial in the matter commenced on September 18, 2008, at which the following was adduced.

¶ 5     Daniel is the oldest of seven children born to Donald J. Romano, Sr. (Buddy), and

---

[1]On September 10, 2008, Daniel filed a motion to voluntarily dismiss his petition for dissolution of marriage. See 735 ILCS 5/2-1009 (West 2008). On September 11, 2008, the trial court granted Daniel's motion.

Florence Marie Romano. During the trial, one of the principal areas of contention involved Daniel's interests in the following companies: (1) Romano Brothers Beverage Company (RBBC); (2) Paramount Distributing Company (Paramount); (3) Central Wholesale Company (Central); (4) Mueller Distributing Company (Mueller); (5) M&D Investments, LLC (M&D); and (6) Power Distributing, LLC (Power). Other members of the Romano family also held interests in these companies. Complicating the ownership structure of the companies was the fact that, beginning in 2001, the Romano family began to implement an estate plan that ultimately involved transferring the family's interests in these entities into and out of various trusts. To this end, Daniel established three irrevocable grantor trusts on October 29, 2001. Daniel's trusts were denominated as follows: (1) the Daniel M. Romano Gift Trust (DMR Gift Trust); (2) the Daniel M. Romano MP Annuity Trust (MP Trust); and (3) the Daniel M. Romano SP Annuity Trust (SP Trust) (collectively, the DMR trusts). Buddy was the trustee of all three DMR trusts.

¶ 6        During the majority of the marriage, Daniel worked at RBBC, a family-owned liquor-distribution company. The predecessor to RBBC, Morand Brothers Beverage Company, was originally owned in part by Daniel's grandfather and later was fully acquired by Daniel's uncle, Michael J. Romano II (Michael II), and Buddy. Between 1989 and 2000, Daniel acquired 59 shares of RBBC stock from Buddy and 12 shares of RBBC stock from his siblings.

¶ 7        Between September 1987 and May 1994, Paramount, Mueller, and Central (collectively, the Affiliates) were acquired. Immediately following the acquisitions, Daniel held a 50% interest in each Affiliate. The remaining 50% interest in each Affiliate was held by Michael II's oldest son, Michael J. Romano III (Michael III).

¶ 8        Just prior to Michael II's death in 1998, he and Buddy formed M&D, a holding company for a 50% share of the profits of Olinger, a liquor-distribution company located in Indiana.[2] Michael III eventually came to own 50% of the shares of M&D, while Buddy owned the other half. Subsequently, Buddy transferred his entire interest in M&D to his four sons (Daniel, Michael D. Romano (Michael D.), Donald J. Romano, Jr. (DJ), and Victor Romano (Victor)) in equal shares. Thus, following the transfer, Daniel, Michael D., DJ, and Victor each owned a 12.5% interest in M&D, while Michael III owned the remaining 50%.

¶ 9        In 2000, Buddy and Michael III formed Power, a distributor of Red Bull energy drink. Michael III owned 50% of the shares of Power, and Buddy owned the other 50%. In 2000, Buddy transferred his entire interest in Power to his four sons in equal shares. Thus, following the transfer, Daniel, Michael D., DJ, and Victor each held a 12.5% interest in Power, while Michael III retained 50%.

¶ 10        Buddy testified that in or about 2001, Michael III expressed a desire to leave the family businesses and sell his interests therein. Although Buddy originally opposed any divestiture, he eventually agreed to sell RBBC and the Affiliates contingent upon three conditions. First, Buddy wanted to more fairly distribute among his seven children any cash proceeds

_____

[2]The other 50% of the distribution company was owned by the Glazer family, who lived in Texas.

generated from the sale of the businesses. Second, Buddy wanted to equalize among the children ownership of any business interests that remained in the family's possession. Third, Buddy wanted to fund the college expenses of his 31 grandchildren. Buddy hired attorney Michael Hartz to create an estate plan that would be consistent with these goals and would protect from taxation the proceeds of any sale of the family businesses. Buddy also hired Thomas Fee, a financial advisor, to assist in implementing and administering the estate plan devised by Hartz. Members of the Romano family met with Hartz and Fee in the fall of 2001. At that time, Hartz advised that Daniel be the "catalyst" of the plan to redistribute wealth among the other family members, because Daniel owned a disproportionate share of the family businesses. As noted above, implementation of the estate plan involved Daniel establishing the DMR trusts.

¶ 11    In October 2001, after the DMR trusts were established, Daniel sold his 71 shares of RBBC stock to the DMR Gift Trust and in exchange received a promissory note from the trust, with interest, for approximately $4.2 million. In addition, Daniel sold his 50% interest in Paramount to the SP Trust and his 50% interests in Central and Mueller to the MP Trust. According to Hartz, the MP Trust and the SP Trust were established as grantor-retained annuity trusts (GRATs). As a result, in exchange for the transfer of his interests in the Affiliates to them, Daniel received a commitment from both the MP Trust and the SP Trust to make annuity payments on the first and second anniversaries of the trusts. Hartz explained that the value of each annuity "is equal to the value of the assets [that are] conveyed into the trust at the time that the trust is initially funded" plus interest. Hartz also created various trusts, including "gift trusts" and GRATs, for Buddy, Michael D., and DJ. Further, Buddy, Michael D., and DJ transferred their business interests to their trusts at the same time as Daniel, and they received similar commitments from their trusts in exchange.

¶ 12    In July 2002, Southern Wine and Spirits, Inc. (SWSI), a liquor-distribution company located in Miami, Florida, purchased the assets of RBBC and the Affiliates for a cash price of $151,012,000. As a result of holdbacks, the Romanos did not receive the entire purchase price. Daniel testified that the breakdown of the purchase price was: $84,075,356 for RBBC; $16,811,298 for Central; $17,636,090 for Mueller; and $26,681,360 for Paramount. Relevant here, the DMR Gift Trust's share of the proceeds of the sale of its interest in RBBC was $6,867,683. Following SWSI's purchase of RBBC and the Affiliates, Daniel began working for SWSI pursuant to a 10-year employment contract. Daniel's base salary at SWSI was $550,000. In addition, Daniel was entitled to an incentive bonus of up to $350,000 per year, which was dependent upon the company's budget, and a discretionary bonus not to exceed $100,000.

¶ 13    Also in July 2002, Michael III's interests in M&D and Power were redeemed. The redemption price was $10 million, of which $8.5 million was attributable to M&D and $1.5 million was attributable to Power. Hartz testified that the funding source for the redemption was RBBC. He explained that the owners of RBBC at the time of the redemption were the DMR Gift Trust and gift trusts established by Buddy, Michael D., and DJ. Thus, when RBBC was sold to SWSI, the Romanos decided to use funds from the sale to redeem Michael III's interests in M&D and Power. Therefore, in July 2002, Michael III received cash in exchange for the value of his shares in the companies, and redemption agreements dated July 2002

were executed.

¶ 14    Meanwhile, in October 2002, Daniel, Michael D., and DJ sold their 12.5% interests in M&D and Power to their respective gift trusts. Victor retained his interest individually. The gift trusts executed contribution agreements dated October 1, 2002, to allocate financial responsibility for the $10 million redemption of Michael III's shares in July 2002, which had been accomplished using their collective funds from the RBBC sale proceeds. The contribution agreements show that, although the gift trusts of Buddy, Michael D., and DJ each contributed from its share of the RBBC sale proceeds to the redemption of Michael III's shares, the DMR Gift Trust contributed a disproportionately higher amount. Fee explained that the DMR Gift Trust's contribution was higher because it would be the eventual instrument used to transfer a one-seventh interest to each of Buddy's three daughters: Patricia Barry (Tricia), Christine Klauer (Chrissy), and Florence Daly (Lulu).

¶ 15    The contribution agreements reflect that Buddy's gift trust contributed $2.857 million to the redemption of Michael III's interests in M&D and Power, for a one-seventh interest in the companies. Because the gift trusts established by Michael D. and DJ each already owned an interest of 12.5% in M&D and Power, they each had to contribute only an additional $357,000 to obtain a one-seventh interest in the companies. Similarly, Victor already owned an interest of 12.5% in both M&D and Power, so he had to contribute only an additional $357,000 to obtain a one-seventh interest in the companies. The DMR Gift Trust acquired the remaining three-sevenths interest in the companies. Since the DMR Gift Trust already owned an interest of 12.5% in M&D and Power, it contributed an additional $6,072,000 to reach its three-sevenths interest in the companies.

¶ 16    Hartz testified that as of October 2002 the DMR Gift Trust still owed Daniel approximately $4.2 million pursuant to the 2001 promissory note it executed when Daniel transferred his shares of RBBC to the DMR Gift Trust. However, the DMR Gift Trust's contribution to the redemption had rendered it cash poor, and it had no way to meet its repayment obligation to Daniel. Accordingly, also in October 2002, the DMR Gift Trust borrowed $6,072,000 from the MP Trust and pledged its three-sevenths interest in M&D and Power as security for the loan. In November 2002, with a portion of the borrowed funds, the DMR Gift Trust repaid Daniel on the 2001 promissory note.

¶ 17    Meanwhile, in 2003, pursuant to the 2001 estate plan, Fee instructed Daniel to personally fund accounts established pursuant to section 529 of the Internal Revenue Code for the benefit of Daniel's children and the children of all of Daniel's siblings. To this end, on September 16, 2003, Daniel contributed $416,000 for Victor's children and $543,000 for his own children. Further, on September 18, 2003, Daniel contributed a total of $432,000 for Tricia's children, $440,000 for Lulu's children, and $280,000 for Chrissy's children. Finally, on August 27, 2004, Daniel contributed $504,000 for Michael D.'s children. Fee testified that the money to fund these accounts came from Daniel's individual brokerage accounts, which are discussed below.

¶ 18    In 2004, after the GRAT annuity periods had ended, the process of equalizing the ownership of the remaining Romano family businesses, M&D and Power, began. To this end, the shares of M&D and Power held by the DMR Gift Trust were transferred to the MP

Trust and the SP Trust. Specifically, the DMR Gift Trust sold a 34.248% interest in M&D and Power to the MP Trust for $8,013,299.20. In exchange, the MP Trust executed a promissory note for $1,810,844.01 to the DMR Gift Trust. The remainder of the sales price was satisfied by cancellation of the October 2002 promissory note for $6,072,000 from the DMR Gift Trust to the MP Trust. In addition, the DMR Gift Trust sold an 8.562% interest in M&D and Power to the SP Trust for $2,003,324.80. The SP Trust executed a promissory note to the DMR Gift Trust for the entire sales price.

¶ 19 Immediately thereafter, the shares of M&D and Power held by the MP and SP Trusts were transferred to discretionary trusts established for Tricia, Chrissy, and Lulu. Following these transfers, the following trusts each held about a one-seventh interest in both M&D and Power: Buddy's gift trust, Michael D.'s gift trust, DJ's gift trust, Tricia's discretionary trust, Chrissy's discretionary trust, and Lulu's discretionary trust. In addition, Victor owned about a one-seventh interest individually. Moreover, Daniel personally retained an ownership interest of 0.05% in both M&D and Power, as well as a beneficial interest for about a one-seventh ownership in the companies as a beneficiary of Buddy's gift trust.

¶ 20 In July 2004, pursuant to the 2001 estate plan, Buddy, as trustee of both the MP Trust and the SP Trust, instructed Fee to distribute from those trusts $2 million to each of the discretionary trusts established for Tricia, Chrissy, and Lulu, as well as a discretionary trust established for Victor.

¶ 21 As noted above, after the sale of RBBC and the Affiliates to SWSI, the DMR trusts repaid Daniel pursuant to the note and annuity agreements executed when Daniel initially funded those trusts in 2001. Fee established several individual brokerage accounts for Daniel and deposited the payments from the DMR trusts into these accounts. In total, between $15 million and $16 million was deposited into Daniel's individual brokerage accounts from the DMR trusts. According to Fee, no deposits were made to the individual brokerage accounts except in connection with the SWSI sale. Fee testified that Daniel used $9 million of these funds to pay taxes owed by the DMR trusts. Fee further testified that, from August 2002 through January 2007, the remaining $6 million from Daniel's individual brokerage accounts was expended to pay family expenses.

¶ 22 Evidence was also presented at trial regarding other assets acquired during the marriage. In 2003, Daniel purchased $5 million in life insurance for the benefit of Cynthia and the parties' descendants. At Daniel's request, Hartz drafted an irrevocable grantor trust designed to own the life insurance (the DMR Family Trust). Hartz testified that under the terms of the DMR Family Trust, the proceeds of the life insurance policy were payable to Cynthia and the parties' descendants as the sole beneficiaries of the trust.

¶ 23 In 1998, the parties purchased property at 704 Deer Trail Lane, Oak Brook, Illinois, which they utilized as the marital residence. The parties and their children lived in the marital residence until Daniel moved out on April 26, 2006. After Daniel moved, Cynthia, the parties' four emancipated children, and the parties' one minor child continued to reside in the marital residence.

¶ 24 In August 2003, Daniel purchased a residence located at 115 Indian Trail, Oak Brook, Illinois (Indian Trail residence). Daniel testified that he intended the purchase to be an

investment for Cynthia and the parties' children. The purchase price of the property was $1.1 million. Daniel testified that he originally intended to obtain a loan to purchase the Indian Trail residence. However, when he approached Cynthia about signing a mortgage on the home to secure the loan, she refused, claiming that Daniel was attempting to cheat her. Accordingly, Daniel asked Fee for funds to purchase the Indian Trail residence. Thereafter, Fee arranged a loan to Daniel from the SP Trust for the purchase of the property. Fee testified that this loan was repaid with interest. Daniel testified that, after the home was purchased, improvements totaling more than $1 million were made to it. According to Daniel, the money for the improvements "came from [his] accounts, from Tom Fee." The parties sold the Indian Trail residence to Cynthia's parents in 2005 for $350,000 and netted $322,899.57 at closing. Cynthia acknowledged that she deposited $300,000 of the net proceeds into a joint bank account, but she was unable to recall what happened to the remainder of the proceeds.

¶ 25    On May 12, 2004, the parties closed on the purchase of property at 706 Deer Trail Lane, Oak Brook, Illinois (706 Deer Trail residence), which is adjacent to the parties' marital residence. The purchase price of the property was $1.35 million. According to Daniel, he asked Fee for the money to purchase the 706 Deer Trail residence. To this end, Fee arranged a loan from the SP Trust, and a mortgage in favor of the SP Trust was executed, pursuant to which Daniel was required to repay the loan amount with interest. Daniel indicated that the mortgage was never recorded. Further, Daniel acknowledged that between May 12, 2004, and September 18, 2008 (the date of his testimony), he had not made a single monthly payment on the mortgage. Fee recounted that he had retained counsel to collect on the loan.

¶ 26    When Daniel moved out of the marital residence in April 2006, he relocated to his parents' residence at 1040 Lake Shore Drive, Unit 37D, in Chicago. In August 2007, Daniel moved out of his parents' residence and rented unit 35D in the same building. In 2006 one of Buddy's trusts purchased unit 35D for $1.65 million. Daniel and his mother were the trustees of the trust that purchased unit 35D. Daniel's rent for unit 35D was $7,500 per month, but Daniel testified that he never had the financial ability to pay it.

¶ 27    In his written closing argument, Daniel asserted that the following property was marital: (1) the marital residence, with a stipulated value of $3 million (marital residence); (2) the 706 Deer Trail residence, with a stipulated value of $1.37 million;[3] (3) the furnishings located at the marital residence; (4) the parties' automobiles; (5) Daniel's 401(k) account; (6) Daniel's A.G. Edwards individual retirement account (IRA); and (7) a loan receivable from Cynthia's brother, Michael Pope, for funds he borrowed from Daniel in 2005. Daniel argued that he had a nonmarital claim in the following assets: (1) his 0.05% interests in M&D and Power; (2) the *de minimis* assets of his individual brokerage accounts; and (3) his interest in an investment fund known as "Pabrai." In addition, Daniel argued that the assets held in the DMR trusts constituted third-party property and therefore were not subject to allocation by the court.

---

[3]In his written closing argument, Daniel indicated that the stipulated value of the 706 Deer Trail residence was $1.7 million. However, the stipulation actually lists the value of this property at $1.37 million.

¶ 28 In her written closing argument, Cynthia claimed that the value of the marital estate exceeded $45 million. Included in her calculation of the marital estate were claims of dissipation against Daniel totaling $20,088,623, which consisted of: (1) the transfers of M&D and Power from the MP Trust and the SP Trust to Tricia, Lulu, and Chrissy; (2) the transfer of $8 million from the MP Trust and the SP Trust to the discretionary trusts of Victor, Tricia, Lulu, and Chrissy; and (3) the contribution of $2,072,000 to the college savings accounts for the children of Daniel's siblings. In support of her dissipation claims, Cynthia contended that the "genesis" of the irreconcilable breakdown of the parties' marriage occurred in March 2000, when she began treatment for breast cancer. Cynthia also asserted in her closing that by the end of 2003 "she had no hope to save her marriage."

¶ 29 The trial court issued a letter opinion with its findings on October 12, 2009. A judgment of dissolution was entered on November 17, 2009. In its letter ruling, the trial court initially noted that credibility was "a particularly significant factor in the court's decision." The court found that "[Daniel's] interests in the Romano companies was [*sic*] [Daniel's] non-marital property, and that the transfers of the proceeds from the sale of the companies were in fact pursuant to a plan for the distribution of wealth generated by the sale of the Romano companies." The court then held that even if the funds from the sale of the family businesses were marital, Cynthia's dissipation claim would fail because Cynthia's claim that the marriage was undergoing an irreconcilable breakdown in 2000 or 2003 was not credible.

¶ 30 The court also held that the condominium where Daniel was living after he moved out of the marital residence was a gift from Daniel's parents. Therefore, the court classified the condominium as Daniel's nonmarital property. In the alternative, the court found that Daniel was solely responsible for debt owed to his parents, *i.e.*, back rent for the time Daniel was living in the condominium. Further, the court classified as nonmarital Daniel's 0.05% ownership interests in M&D and Power.

¶ 31 With respect to the classification and allocation of the remaining property, the court determined that the DMR Gift Trust and the MP Trust were neither marital property nor Daniel's nonmarital property. However, the court held that the SP Trust was marital property, which it allocated to Daniel. In so holding, the court found that Daniel "exercised and has the ability to exercise sufficient control over the *** SP Trust." The court noted that to purchase the 706 Deer Trail residence Daniel took from the SP Trust a $1.3 million mortgage, which was never recorded, and that Daniel never made a payment on that mortgage. The court concluded that, to the extent the lien was valid, it was owed to the SP Trust. However, because the court allocated the SP Trust to Daniel, it found that Daniel either was entitled to the mortgage proceeds or he could forgive the debt. The court further explained that the division of marital property would not change if it had classified the SP Trust as nonmarital property. Although the court assigned to Daniel the liability of the mortgage, the court awarded the property itself to Cynthia.

¶ 32 Ultimately, the trial court allocated the following marital assets to Daniel: (1) 50% of the assets in Daniel's A.G. Edwards IRA, valued at $382,380; (2) 100% of the assets held by the SP Trust, valued at $503,656; (3) 50% of the assets in Daniel's SWSI 401(k), valued at $58,840.50; (4) an automobile valued at $17,826; (5) 100% of an insurance note, valued at $360,000, receivable between Daniel and the DMR Gift Trust; (6) $66,000 held in a bank

account at Harris Bank; (7) 100% of the funds held in any bank account titled solely in Daniel's name (unvalued); (8) 40% of the cash value of any whole-life insurance policies (unvalued); and (9) personal property in Daniel's possession or under Daniel's control (unvalued).

¶ 33    The court allocated the following marital assets to Cynthia: (1) the marital residence, valued at $3 million, subject to a home equity line of credit (HELOC) with an outstanding principal balance of $534,000; (2) the 706 Deer Trail residence, valued at $1.37 million; (3) 100% of the note receivable from Cynthia's brother, valued at $250,000; (4) 50% of the assets in Daniel's A.G. Edwards IRA, valued at $382,380; (5) 50% of the assets in Daniel's SWSI 401(k), valued at $58,840.50; (6) 100% of the funds held in any bank account titled solely in Cynthia's name (unvalued); (7) three vehicles valued at $175,701; (8) 60% of the cash value of any whole-life insurance policies (unvalued); and (9) personal property in Cynthia's possession or under Cynthia's control (unvalued).

¶ 34    With respect to the issue of support, the court noted that, although five children were born to the parties during the marriage, only one (Alexander) remained a minor when the court issued its judgment of dissolution, and Alexander resided with Cynthia under a joint custody agreement. The court fixed child support at $6,000 per month, which it calculated as 20% of Daniel's net income at SWSI. In addition, the court awarded Cynthia periodic modifiable maintenance in the amount of $6,000 per month, subject to termination on statutory grounds. The court also ordered Daniel to pay additional child support of 20% of his net income over his base salary and additional maintenance of 20% of his net income over his base salary. Finally, with respect to attorney fees, the court held that in light of the "grossly disparate division of assets in Cynthia's favor and the payments already authorized by the Court," each party shall be solely responsible for any and all attorney fees and costs and expert fees incurred by them.

¶ 35    Subsequently, the parties filed cross-motions for "clarification" of the judgment of dissolution. In response, the trial court issued a letter opinion dated December 12, 2009. Among other issues, the court addressed Daniel's claim that it failed to account for the predistribution of marital assets to Cynthia for attorney fees. The court ruled that, even after consideration of the predistribution, "the balance of the asset distribution remained within the range of the reasonable." The court also updated the values of certain assets and liabilities, including the HELOC. In addition, the court *sua sponte* reconsidered its awards of maintenance and child support. In doing so, the court set Cynthia's periodic maintenance at $15,000 per month and child support at zero dollars per month. In accordance with the December 12, 2009, letter opinion, an addendum to the judgment of dissolution was filed on January 15, 2010. Both parties have appealed.

¶ 36                                    II. ANALYSIS
¶ 37                              A. Cynthia's Arguments
¶ 38                            1. Classification of Property
¶ 39    The first two issues Cynthia raises on appeal involve the trial court's classification of certain assets. First, Cynthia contends that the "assets used to fund [the DMR trusts]," which

she classifies as "[Daniel's] share of the proceeds from the sale of the assets of RBBC, Paramount, Central and Mueller to SWSI," should have been classified as marital property. Second, she asserts that the trial court's finding that M&D and Power were Daniel's nonmarital property is against the manifest weight of the evidence because marital funds were used to purchase these two entities. We address each contention in turn.

¶ 40                               a. DMR Trusts

¶ 41    Cynthia first challenges the classification of "the assets used to fund" the DMR trusts. Cynthia divides her argument into two parts. Initially, she argues that "the proceeds from [Daniel's] share of the sale of RBBC's assets [to SWSI] are marital property." In particular, citing to *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641 (2009), Cynthia reasons that Daniel's interest in RBBC should be considered marital property because "[Daniel's] employment at RBBC supplied [Daniel] the means to provide for his family during the parties' 25 year marriage." Second, Cynthia argues that "the proceeds from the sale of [Daniel's] share of the assets of Paramount, Central, and Mueller are marital property." In support of the latter claim, Cynthia contends that the evidence establishes that Daniel's "personal funds" were used to acquire the Affiliates.

¶ 42    Although Cynthia frames these issues as a challenge to the trial court's classification of "the proceeds" from the sale of Daniel's share of the assets of RBBC and the Affiliates to SWSI, her arguments actually center on whether either of the underlying assets, *i.e.*, RBBC and the Affiliates themselves, were properly classified by the trial court. Therefore, we focus our analysis on the classification of RBBC and the Affiliates. Prior to doing so, however, we set forth some general principles applicable to the classification of assets and briefly review the trial court's findings with respect to RBBC and the Affiliates.

¶ 43                            i. General Principles

¶ 44    Before a court may distribute property upon the dissolution of a marriage, the court must first classify the property as either marital or nonmarital. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166 (2000). A court's classification of property will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 76; *Henke*, 313 Ill. App. 3d at 166. A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence. *In re Marriage of Ricketts*, 329 Ill. App. 3d 173, 181-82 (2002).

¶ 45    Under the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2008)), there is a rebuttable presumption that all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage is marital property regardless of how title to the property is held. 750 ILCS 5/503(b)(1) (West 2008); *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1017 (2009). This presumption of marital property can be overcome by clear and convincing evidence that the property was acquired by one of the methods listed in section 503(a) of the Act (750 ILCS 5/503(a) (West 2008)). *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000). Among the methods listed in

section 503(a) are the following:

"(1) property acquired by gift, legacy or descent;

(2) property acquired *** in exchange for property acquired by gift, legacy or descent;

* * *

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, nonmarital property, the personal efforts of a spouse, or otherwise, subject to the right of reimbursement ***; and

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." 750 ILCS 5/503(a)(1), (2), (7), (8) (West 2008).

The party claiming that the property is nonmarital carries the burden of proof, and any doubts regarding the nature of the property will be resolved in favor of a finding that the property is marital. *In re Marriage of Johns*, 311 Ill. App. 3d 699, 703 (2000).

¶ 46 We further note that a transfer from a parent to a child is presumed to be a gift. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). This presumption can be overcome by clear and convincing evidence to the contrary. *Hagshenas*, 234 Ill. App. 3d at 186. As we noted in *Hagshenas*, in a case where property is subject to both the presumption that a transfer from a parent to a child is a gift and the presumption that property acquired during the course of a marriage is marital property, the conflicting presumptions cancel each other out, and the trial court is free to determine the issue of whether the asset in question is marital or nonmarital without resort to either presumption. *Hagshenas*, 234 Ill. App. 3d at 186-87. In such circumstances, the trial court's determination is also subject to review under the manifest-weight-of-the-evidence standard. *Hluska*, 2011 IL App (1st) 092636, ¶ 88; *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 737 (2006).

¶ 47                                  ii. Trial Court Ruling

¶ 48 In its October 12, 2009, letter opinion, the trial court ruled that Daniel's interests in the Romano companies, including RBBC and the Affiliates, were Daniel's nonmarital property and that the transfers of the proceeds from the sale of the companies were accomplished "pursuant to a plan for the distribution of wealth generated by the sale of the Romano companies." Further, in its judgment of dissolution entered November 17, 2009, the trial court found that the assets of the DMR Gift Trust and the MP Trust were "neither part of the marital estate nor Daniel's nonmarital property." The court did find, however, that the assets of the SP Trust constituted marital property. While the rationale for the trial court's findings that RBBC and the Affiliates were Daniel's nonmarital property is not entirely clear from the record, we note that we review the correctness of the trial court's *result* rather than the correctness of its *reasoning*. *In re Marriage of Ackerley*, 333 Ill. App. 3d 382, 392 (2002).

¶ 49                                      iii. RBBC

-11-

¶ 50    As noted above, Cynthia, relying on *Sanfratello*, 393 Ill. App. 3d 641, argues that Daniel's interest in RBBC should be considered marital property because "[Daniel's] employment at RBBC supplied [Daniel] the means to provide for his family during the parties' 25 year marriage." However, we find that the evidence supports the trial court's finding that Daniel's interest in RBBC was his nonmarital property.

¶ 51    The evidence at trial established that, prior to October 2001, Daniel possessed 71 shares of RBBC stock. Daniel obtained the stock from two sources: his siblings and his father. With respect to the former, Daniel testified that he obtained 12 of these shares in 1994 from three of his siblings. Because transfers among siblings are not presumed to be gifts (see *In re Marriage of Awan*, 388 Ill. App. 3d 204, 213 (2009)) and because Daniel obtained these shares during the marriage, there is a rebuttable presumption that these shares are marital. 750 ILCS 5/503(b)(1) (West 2008); *Hluska*, 2011 IL App (1st) 092636, ¶ 77. However, as noted above, the presumption of marital property can be overcome by clear and convincing evidence that the property was acquired by one of various methods, including a gift. 750 ILCS 5/503(a)(1), (b)(1) (West 2008); *Didier*, 318 Ill. App. 3d at 258. A gift has been defined as " 'a voluntary gratuitous transfer of property from donor to donee where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee.' " *Didier*, 318 Ill. App. 3d at 259 (quoting *In re Estate of Poliquin*, 247 Ill. App. 3d 112, 115 (1993)); see also Black's Law Dictionary 696 (7th ed. 1999) (defining a "gift" as "[t]he act of voluntarily transferring property to another without compensation"). Here, Daniel established that his acquisition of 12 shares of RBBC stock from his siblings was a gift.

¶ 52    First, there was evidence of a gratuitous, voluntary transfer of property. Daniel testified that his siblings "g[a]ve" him 12 shares of stock. He further testified that he did not compensate his siblings for the 12 shares of stock and that neither he nor any third party was obligated to repay his siblings for these shares. Cynthia did not present any evidence to the contrary. Second, there was evidence that Daniel's siblings intended to make a gift and that there was an absolute and irrevocable delivery of property. In this regard, the record contains a certificate reflecting the transfer of the 12 shares of stock from Daniel's siblings to Daniel as well as copies of the cancelled stock certificates that were originally issued to Daniel's siblings. Because the evidence supports a finding that Daniel's acquisition of these 12 shares of RBBC stock from his siblings constituted a gift, the trial court could have reasonably determined that they constituted Daniel's nonmarital property. Accordingly, we cannot say that the trial court's classification of them as Daniel's nonmarital property is against the manifest weight of the evidence.

¶ 53    Daniel received the remaining 59 shares of RBBC stock from his father. The transfer of these shares is subject to conflicting presumptions. First, there is a presumption that the transfer was a gift, because Daniel testified that he obtained these shares from his father over a course of several years, beginning in 1989. *Hagshenas*, 234 Ill. App. 3d at 186. Further, because the transfer of these shares occurred after the parties' marriage, there is also a presumption that they are marital property. 750 ILCS 5/503(a)(1), (b)(1) (West 2008). As noted above, because these 59 shares are subject to conflicting presumptions, the presumptions cancel each other out, and the trial court was free to determine whether they

-12-

were marital or nonmarital without resort to either presumption. *Hagshenas*, 234 Ill. App. 3d at 186-87.

¶ 54    The evidence presented at trial supports a finding that the 59 shares of RBBC stock Daniel received from Buddy was a gift and therefore constituted Daniel's nonmarital property. First, there was evidence of a voluntary, gratuitous transfer. As he testified with respect to the transfer from his siblings, Daniel recounted that he did not compensate Buddy for the 59 shares of stock and that neither he nor any third party was obligated to repay Buddy for the shares. Buddy noted that, although Daniel had worked for RBBC for many years, the stock was not given to Daniel as any type of compensation for his work. In addition, Cynthia does not cite any evidence that Daniel paid anything for these shares or that he expended any personal efforts in exchange for the shares. There was also evidence of donative intent. Buddy testified that he intended to give Daniel the shares as a gift because Daniel was his son. See *In re Marriage of Simmons*, 221 Ill. App. 3d 89, 92 (1991) ("It has been held that the evidence most relevant in determining donative intent is the donor's own testimony."). Finally, there was evidence of absolute and irrevocable delivery. Gift tax returns filed by Buddy between 1989 and 2000 were admitted into evidence. They reflect the 59 shares gifted to Daniel. In addition, copies of the stock certificates reflecting these transfers were admitted into evidence. Indeed, the evidence establishes a pattern of endowment by Buddy with respect to his RBBC shares. In this regard, both DJ and Michael D. testified at trial that they too had been given shares of RBBC by Buddy. Thus, the evidence supports a finding that the 59 shares Buddy transferred to Daniel constituted a gift. As such, we cannot say that the trial court's decision that the shares were Daniel's nonmarital property is against the manifest weight of the evidence.

¶ 55    Cynthia does not seem to dispute that Daniel acquired his interest in RBBC as a gift. Rather, relying on *Sanfratello*, 393 Ill. App. 3d 641, she suggests that "the presumption of gift should not overcome the presumption of marital property where the gifted property provided the husband the means of supporting his family during the marriage." We note initially that, contrary to Cynthia's suggestion, this case does not present a situation in which the presumption of gift "overcame" the presumption of marital property. As noted above, the gift presumption does not apply with respect to transfers among siblings. *Awan*, 388 Ill. App. 3d at 213. Furthermore, although the gift presumption applied with respect to the shares of stock acquired from Buddy, it operated only to cancel out the conflicting presumption that the stock, having been acquired during the marriage, was marital. *Hagshenas*, 234 Ill. App. 3d at 186-87. The trial court was then free to determine the classification of the stock without resort to either presumption. *Hagshenas*, 234 Ill. App. 3d at 186-87. We now turn to *Sanfratello*.

¶ 56    In *Sanfratello*, one of the principle areas of contention involved the husband's employment with, and ownership interests in, three pizza restaurants, two of which were opened during the parties' marriage. At trial, the husband claimed that he had no ownership interests in the businesses and was a mere employee. He also asserted that his only income was derived from his employment at the restaurants, which totaled about $2,200 every two weeks. Although his tax returns supported the claim that this had been his salary for the past 20 years, he admitted to making large cash deposits of additional money into his personal

bank account. Further, the wife had testified that many of the family's expenses during the marriage, including "expensive dinners, designer clothing, and groceries," had been paid in cash. Given these facts, the trial court imputed to the husband an annual income of $130,000, based on the uncontested evidence that he had a steady flow of cash available to him. In addition, the court classified as marital property the husband's interests in the two restaurants that were opened during the marriage.

¶ 57    On appeal, the husband argued that the trial court erred in classifying as marital property his interests in the two restaurants opened during the marriage, because those interests were gifts from his parents. The court affirmed the trial court's classification, reasoning that, because these interests were acquired during the marriage, they were presumptively marital, and the husband had not proved that the marital presumption should be disturbed. *Sanfratello*, 393 Ill. App. 3d at 649-50. Furthermore, the court observed that the restaurants provided the husband with a means of supporting his family well beyond the income he claimed was compensation for his personal efforts. *Sanfratello*, 393 Ill. App. 3d at 650.

¶ 58    According to Cynthia, like the husband in *Sanfratello*, the parties' lavish lifestyle was financed by Daniel's involvement in RBBC, and, like in *Sanfratello*, his interest in RBBC should therefore be considered marital property. We find that the facts of *Sanfratello* are dissimilar to the facts of the case at bar and, therefore, Cynthia's reliance on that case is misplaced. In *Sanfratello*, two of the restaurants were founded during the marriage, but, at trial, the husband initially denied that he had any ownership interests in the restaurants and then later claimed that the interests he had were given to him by his parents. Here, unlike in *Sanfratello*, Daniel did not found RBBC during the marriage. Instead, Daniel's grandfather founded the company long before Daniel was even born. Daniel's father and uncle later fully acquired the business. Further, the evidence at trial, including testimony, gift tax returns, and stock certificates, demonstrated that Daniel had been gifted all of his interest in RBBC. No evidence of a gift was presented at all in *Sanfratello* because at trial the husband initially denied possessing interests in the restaurants.

¶ 59    Moreover, the husband in *Sanfratello* received a low salary from his employment at the restaurants, and he admitted to taking cash from them for his personal use. Considering his regular use of cash from the restaurants, the court imputed to him an annual income of $130,000. In the present case, there was evidence that Daniel, prior to the sale of his RBBC stock, received a substantial salary ($350,000) for his employment with RBBC, as compensation for his personal efforts. Further, there was no evidence that Daniel was a majority shareholder of RBBC or that he had any control over or access to RBBC's retained earnings. As such, throughout the parties' marriage, the parties' lifestyle was based on Daniel's income from employment. It was not until the sale of his ownership interests in RBBC to the DMR trusts and the ultimate sale of RBBC's assets to SWSI that Daniel received any considerable income due to his interests in RBBC. Because the only similarity between the instant case and *Sanfratello* is that Daniel worked at one time for a family business, we reject Cynthia's reliance on that case for her claim that RBBC is marital property.

-14-

Cynthia argues that the three Affiliates are presumptively marital property because each entity was acquired after the parties married on June 12, 1987. Citing to *In re Marriage of Landfield*, 209 Ill. App. 3d 678 (1991), Cynthia asserts that the testimony provided by Daniel was insufficient to defeat the presumption of marital property. In support, she notes that the *Landfield* court stated that "the presumption that all property acquired after marriage is marital property with certain exceptions does not disappear or cease to operate based only on [the husband's] testimony of the way he acquired [the property]." *Landfield*, 209 Ill. App. 3d at 692.

The evidence presented at trial established that Paramount was acquired in September 1987, Central was acquired in 1993, and Mueller was acquired in 1994. Further, as discussed more thoroughly below, the testimony presented at trial showed that the Affiliates were acquired by Daniel and Michael III. As Daniel acquired his interests in all three Affiliates after the parties' marriage in June 1987, Cynthia correctly argues that these three entities are presumptively marital property. 750 ILCS 5/503(b)(1) (West 2008). Moreover, unlike Daniel's acquisition of some of the shares of RBBC, the acquisition of the Affiliates does not present a case of conflicting presumptions. The gift presumption applies only to transfers between a parent and a child. See *Awan*, 388 Ill. App. 3d at 213 (noting that, unlike transfers between parents and their children, transfers of property among siblings are not presumed to be gifts). As we discuss below, the evidence establishes that the funds Daniel used to purchase the Affiliates did not come directly from his parents. Accordingly, it was Daniel's burden to overcome the presumption of marital property by a showing of clear and convincing evidence that the property was acquired by one of the methods listed in section 503(a) of the Act (750 ILCS 5/503(a) (West 2008)). *Didier*, 318 Ill. App. 3d at 258; *Johns*, 311 Ill. App. 3d at 702-03. We now examine the evidence presented regarding the acquisition of the Affiliates.

With respect to Paramount, the record shows that on September 22, 1987, RBBC entered into a stock purchase agreement pursuant to which RBBC agreed to purchase Paramount's stock. Joseph Topinka, RBBC's former chief financial officer and treasurer, testified, however, that RBBC's accountants determined that RBBC would lose its status as an S-Corporation if it owned 80% or more of another corporation's stock. Thus, RBBC could not directly own Paramount. Accordingly, the ownership interests in Paramount were placed in the names of Daniel and Michael III. Although Topinka described the transaction as "kind of a gratuitous transfer to their sons" from Buddy and Michael II, Topinka explained that *RBBC* gave Daniel and Michael III the funds to purchase Paramount. Topinka further testified that neither Daniel nor Michael III expended any personal efforts to obtain that money. Topinka also noted that, as part of the acquisition of Paramount, RBBC executed a guarantee of Paramount's debts. Topinka testified that the acquisitions of Central in 1993 and Mueller in 1994 were structured in the same fashion, with RBBC providing Daniel and Michael III the funds with which to purchase the companies. Topinka added that neither Daniel nor Michael III contributed any services or work to RBBC in exchange for the funds provided to them to purchase Central and Mueller and that RBBC also guaranteed loans on behalf of the two companies.

¶ 64      Similarly, Daniel explained that he and Michael III acquired the three Affiliates using funds provided by RBBC. Daniel explained that RBBC would write a check for his share of the purchase price. Daniel would deposit these funds into his personal account and then write a check for the same amount of money to make the acquisition. Daniel testified that he did not render any personal services in exchange for these funds and that he never reimbursed RBBC for the funds the company provided. For his part, Buddy testified that Daniel and Michael III each owned a 50% share in each of the three Affiliates. Although Buddy stated that he gave Daniel the interests in the Affiliates, he also indicated, consistent with the testimony of Topinka and Daniel, that the funds used to purchase the Affiliates came from RBBC. Buddy also testified that Daniel did not have to pay any money to acquire his interests in the Affiliates and that RBBC guaranteed notes for the Affiliates.

¶ 65      Thus, Daniel established that the transfer of funds to him by RBBC to purchase the Affiliates was accomplished through a voluntary, gratuitous transfer that was not in exchange for compensation. See *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 862 (1998) (holding that shares of stock acquired by the wife pursuant to a corporate resolution executed by her father constituted a gift and were therefore the wife's nonmarital property). Thus, we conclude that the trial court's finding that Daniel's interests in the Affiliates were his nonmarital property is not against the manifest weight of the evidence. We find Cynthia's reliance on *Landfield* misplaced, as the foregoing evidence establishes that, contrary to Cynthia's claim, more than just Daniel's testimony was offered to rebut the presumption that the Affiliates were marital property.

¶ 66      Despite the foregoing evidence, Cynthia asserts that Daniel's claim that he acquired the Affiliates with funds provided by RBBC is not borne out by the record. In support, Cynthia points to (1) applications filed with the Bureau of Alcohol, Tobacco, and Firearms for an importer's and/or wholesaler's basic permit (ATF applications), which suggest that the funds used to purchase the Affiliates were Daniel's "personal funds"; (2) the fact that no notes were executed to memorialize the funds supplied to Daniel (and Michael III) by RBBC to make the purchases; and (3) the fact that the funds supplied by RBBC were carried as a draw. We find none of these claims persuasive.

¶ 67      With respect to Cynthia's first contention, three ATF applications were filed, one for each Affiliate. The ATF application for Paramount was filed on October 26, 1987. The application indicated that Daniel would be investing $58,000 in Paramount, that the "source of [the] funds invested in [the] business" was Daniel's "personal funds," and that those funds "will be paid out of Savings Account(s), Checking Account(s) and/or loans as deemed advisable by investment market conditions at the time." ATF applications were also filed with respect to Central and Mueller. Although the amounts Daniel would be investing in Central and Mueller differed, the ATF applications for both Central and Mueller also described the source of the funds Daniel would provide as "personal funds." The ATF applications for Central and Mueller also indicated that these "personal funds" would be paid out of savings accounts, checking accounts, loans, and/or investments "as deemed advisable by the investment market conditions at the time."

¶ 68      Cynthia insists that, because the ATF applications referenced Daniel's "personal funds" as the source of his investment in the three Affiliates, Daniel "was the purchaser of his

interest in each of these entities and each of the purchases were made from [Daniel's] personal funds, after the parties were married." However, as Daniel points out, the term "personal funds" is not synonymous with "marital funds" under section 503 of the Act (750 ILCS 5/503 (West 2008)). Moreover, Cynthia does not provide any legal support for the claim that the term "personal funds" as used in the ATF applications has any bearing on the trial court's classification of the funds. The ATF applications themselves suggest that "personal funds" merely means that the funds used to invest in the businesses came from a personal account. In addition, the fact that there were no notes to memorialize the funds supplied by Daniel and Michael III substantiates Daniel's argument that the funds were intended as a gift. See *Didier*, 318 Ill. App. 3d at 265-66 (finding that transferred funds were a gift rather than a loan where funds were never repaid and no promissory note was executed).

¶ 69     Cynthia also claims that the record shows that the funds supplied by RBBC to Daniel were treated as "salary, bonus, or some other form of income to [Daniel] for his employment at RBBC." However, the trial evidence established that Daniel expended no personal efforts in order to receive the funds. Moreover, the evidence indicated that Daniel was adequately compensated for his work at RBBC. In this regard, Daniel testified that his salary at RBBC in the mid-to-late nineties was approximately $250,000 per year. Daniel further testified that by 2002 his salary from RBBC had increased to $350,000 per year. For these reasons, we find that the trial court's classification of the Affiliates as Daniel's nonmarital property is not against the manifest weight of the evidence.

¶ 70                                    b. M&D and Power

¶ 71     Cynthia next contends that Daniel's interests in M&D and Power are marital assets because marital funds were used to purchase them. Specifically, Cynthia asserts as follows. In July 2002, the MP Trust received more than $15 million as its share of the sale to SWSI of two of the Affiliates (Central and Mueller). Cynthia then cites to the testimony of one of her witnesses, attorney Jay Tarshis, for the proposition that, on October 1, 2002, the MP Trust loaned the DMR Gift Trust $6,072,000 to purchase interests in M&D and Power. According to Cynthia, the Affiliates were marital assets. Thus, she reasons, the funds used by the DMR Gift Trust to purchase M&D and Power were obtained from the sale of marital assets (Central and Mueller), so the property acquired with these funds–M&D and Power–must also be marital assets.

¶ 72     Cynthia's argument is based on the assumption that the Affiliates are marital property. However, the trial court determined that the Romano companies, including the Affiliates, were Daniel's nonmarital property. As noted above, we do not find persuasive Cynthia's argument for overturning the trial court's decision. In addition, the evidence establishes that any interest Daniel or the DMR Gift Trust acquired in M&D and Power did not constitute marital property.

¶ 73     Daniel originally acquired an interest in M&D in 1998 and an interest in Power in 2000. As these interests were acquired after the marriage, there is a presumption that these interests are marital. 750 ILCS 5/503(b)(1) (West 2008); *Didier*, 318 Ill. App. 3d at 258. However,

the gift presumption also arises as Daniel's interests in M&D and Power were acquired from his father. *Didier*, 318 Ill. App. 3d at 258. Thus, the two conflicting presumptions cancel each other out, and the trial court was free to determine the classification of these interests without regard to either presumption. *Didier*, 318 Ill. App. 3d at 258-59. The trial court found that Daniel's interests in M&D and Power were Daniel's nonmarital property. Although the trial court did not explain its reasoning in depth, we reiterate that we review the result reached by the trial court, not its reasoning. *Ackerley*, 333 Ill. App. 3d at 392. In this case, we cannot say that the trial court's finding that Daniel's interests in M&D and Power were nonmarital property is against the manifest weight of the evidence.

¶ 74    The evidence at trial established that Daniel acquired his interests in M&D and Power as gifts from Buddy. As noted above, a gift is " 'a voluntary gratuitous transfer of property from donor to donee where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee.' " *Didier*, 318 Ill. App. 3d at 259 (quoting *In re Estate of Poliquin*, 247 Ill. App. 3d at 115). The record shows that, just prior to Michael II's death in 1998, Michael II and Buddy formed M&D. Daniel testified that Michael III eventually came to own a 50% interest in M&D and that Buddy owned the other 50% of M&D. Buddy testified that he gifted his entire interest in M&D to his four sons in equal shares. The transfers of Buddy's interest in M&D to his four sons is reflected on Buddy's 1998 federal gift tax return. Thus, following the transfers, Daniel and his three brothers each owned a 12.5% interest in M&D.

¶ 75    Buddy testified that in 2000 he and Michael III formed Power. Michael III owned 50% of the shares of Power and Buddy owned the other 50%. Buddy testified that in 2000 he gifted his entire interest in Power to his four sons in equal shares. The transfers of Buddy's interest in Power to his four sons is reflected on Buddy's 2000 federal gift tax return. Daniel testified that he did not pay anything for the interest in Power he obtained from Buddy and that, to the best of his knowledge, neither did his siblings. Thus, following the transfers, Daniel and his three brothers each owned a 12.5% interest in Power.

¶ 76    The foregoing evidence established that Daniel acquired his interests in M&D and Power as a result of voluntary, gratuitous transfers. Further, Buddy manifested an intent to make such gifts by testifying as such and filing a gift tax return reflecting the gifts. Moreover, the gift tax return also established that the interests in M&D and Power were absolutely and irrevocably transferred to Daniel. Finally, Cynthia does not cite any counterevidence establishing that Daniel paid anything for the shares or that he expended any personal efforts in exchange for the shares. As the record establishes Daniel's interests were acquired by gift from Buddy, we find that the trial court's conclusion that Daniel's interests in M&D and Power were his nonmarital property is not against the manifest weight of the evidence.

¶ 77    The record shows that Daniel subsequently transferred his 12.5% interests in M&D and Power to the DMR Gift Trust in October 2002. Further, the rest of the ownership interests that the DMR Gift Trust held in M&D and Power derived from Michael III, when his shares in the two companies were redeemed. To this end, in July 2002, Michael III executed separate agreements with M&D and Power whereby each company agreed to redeem Michael III's shares for an aggregate price of $10 million. Hartz testified that Michael III received the funds in July 2002 and that the source of the funds was the proceeds of the sale

of RBBC to SWSI.[4] Of the proceeds the DMR Gift Trust received from the sale of its share of RBBC to SWSI, $6,072,000 was used to acquire a three-seventh share in each of the entities. In other words, it was the DMR Gift Trust, a third-party entity, that redeemed a total three-sevenths share of Michael III's interests in M&D and Power, and the DMR Gift Trust used the proceeds from the RBBC sale to redeem the interests.

¶ 78    While Cynthia is correct that the MP Trust loaned $6,072,000 to the DMR Gift Trust, the record shows that that loan did not occur until October 2002, several months after Michael III had been paid in full and all of his shares of M&D and Power had been acquired. Moreover, the proceeds of the October 2002 loan from the MP Trust to the DMR Gift Trust were used by the DMR Gift Trust to pay its outstanding obligation to Daniel on the 2001 promissory note issued when the DMR Gift Trust purchased Daniel's 71 shares of RBBC stock.

¶ 79                                                2. Missing Funds

¶ 80    Next, Cynthia contends that the trial court's judgment failed to account for millions in "missing funds." In particular, Cynthia contends that $6,429,000 is "missing" from the DMR Gift Trust and that Daniel failed to provide a discernable reason why the funds were not deposited into the trust. Cynthia maintains that the trial court erred by not addressing the issue of this "missing" money in its judgment or addendum and that either the marital estate or Daniel's nonmarital estate was undervalued as a result. Daniel responds that Cynthia's argument is based on her misapprehension regarding the transactions leading to the redemption of Michael III's shares of M&D and Power. Thus, he asserts that there are no missing funds for which he could account. We find that Daniel's position is supported by the record.

¶ 81    The parties agree that the DMR Gift Trust was due a total of $6,876,683 from the proceeds of the sale of RBBC's assets to SWSI. Although this entire amount was not deposited into the DMR Gift Trust's brokerage account, the record does not support Cynthia's claim that more than $6 million of these funds is missing. Hartz testified that, when RBBC's assets were sold to SWSI, the owners of RBBC were the DMR Gift Trust and gift trusts established for Buddy, Michael D., and DJ. According to Hartz, the trusts did not actually receive the proceeds of the sale of RBBC's assets. Instead, the Romanos used the proceeds owed to the trusts to redeem Michael III's interests in M&D and Power. In other words, a portion of the proceeds of the sale of RBBC's assets went directly to Michael III.

¶ 82    Cynthia contends that the proceeds of the sale of RBBC's assets to SWSI could not have been used to redeem Michael III's shares in M&D and Power, because "it appears that [the

---

[4]In her reply brief, Cynthia argues that, since the money used to redeem Michael III's shares in M&D and Power came from the proceeds of the sale of RBBC to SWSI, the resultant redemption is also marital property. Cynthia did not raise this argument in her opening brief. Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008) provides that points not argued in the appellant's opening brief are forfeited and shall not be raised in the appellant's reply brief. Moreover, as set forth above, Daniel's interest in RBBC was acquired by gift and was therefore his nonmarital property.

DMR] gift trust borrowed $6,072,000 on October 1, 2002 from the MP trust to make its purchase of M&D and Power." However, Hartz testified that Michael III received the funds for the redemption of his interests in M&D and Power in July 2002. Thus, Cynthia's contention does not account for the fact that this loan came several months *after* Michael III had been paid in full for his shares. Furthermore, as noted above, and according to Daniel, the reason the DMR Gift Trust borrowed $6,072,000 from the MP Trust was so that it could meet its obligation to pay Daniel in 2002 on the promissory note that the trust executed in Daniel's favor in 2001, when Daniel sold the DMR Gift Trust his shares of RBBC stock. Daniel's explanation is borne out by the record. Hartz testified regarding the funds the DMR Gift Trust borrowed from the MP Trust in October 2002. Hartz noted that, when Daniel sold his RBBC stock to the DMR Gift Trust, it issued a promissory note to Daniel. Hartz further noted that, to pay Daniel on the note, the DMR Gift Trust needed cash. Therefore, Hartz stated, the loan between the DMR Gift Trust and the MP Trust "acted as a mechanism for getting liquidity into the gift trust." Accordingly, we do not find Cynthia's argument persuasive.

¶ 83                                    3. Dissipation

¶ 84        Next, Cynthia challenges the trial court's ruling on dissipation. She asserts that, in rejecting her dissipation claim, the trial court applied an incorrect legal standard for determining when the irreconcilable breakdown of the parties' marriage occurred. Cynthia further asserts that, if the court had utilized the proper standard, the evidence would have supported a finding that the marriage began undergoing an irreconcilable breakdown as early as 2000. Cynthia alleges dissipation by Daniel in the total amount of $26,777,632, which she breaks down as follows: (1) $10,016,623 attributable to the October 2004 transfer of the three-sevenths interests in M&D and Power from the MP Trust and the SP Trust to Daniel's three sisters; (2) $8 million attributable to the July 2004 transfer of funds from the MP Trust and the SP Trust to Daniel's three sisters; (3) $1,152,000 attributable to the September 2003 transfer of money from Daniel's brokerage account to fund college savings accounts for the children of Daniel's three sisters; (4) $416,000 attributable to the September 2003 transfer of money from Daniel's brokerage account to fund college savings accounts for Victor's children; (5) $504,000 attributable to the August 2004 transfer of money from Daniel's brokerage account to fund college savings accounts for Michael D.'s children; (6) $260,000 attributable to the February 2004 transfer of funds from the DMR Gift Trust to Victor and Daniel's three sisters; and (7) $6,429,000 attributable to the funds allegedly missing from the DMR Gift Trust, as discussed in the previous section.

¶ 85        As a threshold matter, we note that our earlier conclusion that there are no funds missing from the DMR Gift Trust renders moot Cynthia's claim that these funds constitute dissipation. Additionally, we point out that issues not raised in the trial court are deemed forfeited and may not be raised for the first time on appeal. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996). Here, Cynthia did not maintain in her written closing argument to the trial court that the $6,429,000 in funds allegedly missing from the DMR Gift Trust constituted dissipation. Although Daniel raises the issue of forfeiture in his brief before this court, Cynthia has not responded to it in her reply brief. In fact, although she discusses the

-20-

other six examples of dissipation cited above, she does not reference these funds in the dissipation section of her reply brief, thereby effectively abandoning the claim. See *First National Bank of Chicago v. McCarthy*, 334 Ill. App. 480, 483 (1948). In addition, Cynthia did not argue in her written closing argument before the trial court that the February 2004 transfer of $260,000 to Victor and Daniel's three sisters constituted dissipation. As such, we find that Cynthia is precluded from arguing on appeal that these two sums constituted dissipation. See *Haudrich*, 169 Ill. 2d at 536. Forfeiture notwithstanding, an examination of the merits fails to support Cynthia's claims that these two expenditures or any of the other five expenditures referenced by Cynthia constituted dissipation.

¶ 86    When dividing marital property, the trial court is required to consider all relevant factors, including those listed in section 503(d) of the Act. 750 ILCS 5/503(d) (West 2008). Among the factors listed in the statute is "the dissipation by each party of the marital or non-marital property." 750 ILCS 5/503(d)(2) (West 2008). Our supreme court has defined dissipation as used in section 503(d) to mean "the 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990) (quoting *In re Marriage of Petrovich*, 154 Ill. App. 3d 881, 886 (1987)). Whether dissipation has occurred is a question of fact to be determined by the trial court, and such a determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008). As noted previously, a factual determination will be found to be against the manifest weight of the evidence only when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on the evidence. *Ricketts*, 329 Ill. App. 3d at 181-82.

¶ 87    The trial court rejected Cynthia's claim of dissipation, finding that Cynthia's allegation that the parties' marriage "was undergoing an irreconcilable breakdown as far back as 2000 or 2003" was not credible. The court expounded on this conclusion in its October 12, 2009, letter opinion:

"The notion that any dispute during the course of a marriage that ultimately ends in divorce is enough to find that the marriage is 'undergoing an irretrievable breakdown' ignores human nature and the realities of life. Dissipation has become the 'silver bullet' of divorce litigation, and virtually every case now contains allegations that the marriage was undergoing an irretrievable breakdown, and an accounting of expenditures must be made in the face of an allegation of dissipation. Candidly, absent some fairy-tale marriage where no dispute of any consequence arises, and then the parties suddenly divorce, the holding of *Hazel* is the appropriate law to be applied in the face of the ever-present allegations of dissipation.

An irretrievable breakdown is not a 'prolonged gradual process extending from the initial signs of trouble in a marriage until the actual breakdown itself.' *In re Marriage of Hazel*, 219 Ill. App. 3d 920, 921 *** (5th Dist. 1991). Rather, the date of irretrievable breakdown is the date by which it is apparent that a breakdown is inevitable. *Id*. at 922. Courts define the date of irretrievable breakdown in this way in order to avoid the overly burdensome task of 'examin[ing] every argument or conflict in the marriage from the moment the vows are exchanged to the date of

dissolution.' *Id*. at 921-22. *Cf. In re Marriage of Holthaus*, 387 Ill. App. 3d 367 ***
(2nd Dist. 2008).

Using the standards set forth above, the Romano marriage was not 'undergoing an irretrievable breakdown' in either 2000 or 2003. In further support of this conclusion, the court finds Cynthia's testimony in this regard less credible that [*sic*] [Daniel's]. The 'dissipation' aspect of this case arose well into the litigation, when Cynthia apparently realized that these 'transfers', even if of marital property, could not form the basis of a claim unless they could be characterized as dissipation. Her testimony as to the alleged 'evolution' of the irretrievable breakdown was not persuasive, and the trial court is in the best position to evaluate the credibility of the witnesses."

¶ 88　　As noted above, Cynthia argues that, when the trial court determined that the parties' marriage was not undergoing an irreconcilable breakdown in 2000 or 2003, the court applied an incorrect legal standard. According to Cynthia, rather than examining when the parties' marriage *began* undergoing an irreconcilable breakdown–the standard set forth in *Holthaus*–the trial court improperly looked to the *precise date* on which the breakdown of the parties' marriage was inevitable. Cynthia asserts that the trial court's citation to *Hazel* demonstrates that the court utilized this improper standard. To place Cynthia's arguments in context, we examine *Holthaus* and *Hazel*.

¶ 89　　In *Holthaus*, we rejected the notion that dissipation occurs only *after* an irreconcilable breakdown. *Holthaus*, 387 Ill. App. 3d at 374-75. Rather, in accordance with the supreme court's pronouncement in *O'Neill*, we held that dissipation should be calculated from when the parties' marriage *began* undergoing an irreconcilable breakdown. *Holthaus*, 387 Ill. App. 3d at 374-75. In *Holthaus*, the trial court held that "February 2005 is the date that the marriage was irretrievably broken." Based on this language, we found that the trial court "was attempting to pinpoint the date on which the parties' marriage 'was irretrievably broken' rather than attempting to determine when the marriage began to irreconcilably break down." *Holthaus*, 387 Ill. App. 3d at 375. We concluded that the trial court's error in applying the incorrect standard was not harmless, because the evidence established that the parties' marriage was undergoing an irreconcilable breakdown prior to February 2005. *Holthaus*, 387 Ill. App. 3d at 377. Accordingly, we reversed the trial court's decision on dissipation and remanded the matter for further proceedings. *Holthaus*, 387 Ill. App. 3d at 377.

¶ 90　　In *Hazel*, the trial court determined that the parties' marriage began undergoing an irreconcilable breakdown on January 1, 1988. On appeal, the wife asserted that the marriage began undergoing an irreconcilable breakdown at a much earlier date. She maintained that the use of the term "undergoing" suggested that "an irreconcilable breakdown may be viewed as a prolonged gradual process extending from the initial signs of trouble in a marriage until the actual breakdown itself." *Hazel*, 219 Ill. App. 3d at 921. The *Hazel* court rejected the wife's interpretation, finding that to adopt her meaning "would require courts to examine every argument or conflict in the marriage from the moment vows are exchanged to the date of dissolution to determine if such an event was in fact the moment at which the marriage began undergoing irreconcilable breakdown." *Hazel*, 219 Ill. App. 3d at 921-22. The *Hazel* court acknowledged that the wife cited incidents and conflicts that appeared to mark the

beginning of a gradual process culminating in marital breakdown. However, the court determined that the actions cited by the wife "cannot be said to display a marriage inevitably headed for breakdown. Thus, they cannot be said to signal the start of the process 'undergoing irreconcilable breakdown.' " *Hazel*, 219 Ill. App. 3d at 922.

¶ 91 Cynthia asserts that the trial court's citation to *Hazel* and its statement that "the date of irretrievable breakdown is the date by which it is apparent that a breakdown is inevitable" is the "same kind of faulty reasoning that was rejected by this court in *Holthaus*." According to Cynthia, the trial court's statement indicates "an effort to determine the actual date of the irreconcilable breakdown rather than the time that the marriage begins to undergo an irreconcilable breakdown." However, Cynthia misconstrues *Hazel*. In *Holthaus*, we did not overrule *Hazel* either expressly or tacitly. The point the *Hazel* court was trying to make is that not every incident or conflict that occurs during a marriage signals that the marriage has begun to undergo an irreconcilable breakdown. See *In re Marriage of Zweig*, 343 Ill. App. 3d 590, 598-99 (2003) (discussing *Hazel*). The *Hazel* court noted that many couples experience problems during marriage. *Hazel*, 219 Ill. App. 3d at 921. However, to establish dissipation, the marriage has to be "undergoing *irreconcilable* breakdown." (Emphasis added.) *Hazel*, 219 Ill. App. 3d at 921 (citing *O'Neill*, 138 Ill. 2d at 497). The term "irreconcilable" is defined as "impossible to bring into friendly accord or understanding: hostile beyond the possibility of reconciliation." Webster's Third New International Dictionary 1195 (2002). Thus, for instance, in *Hazel*, the court acknowledged the wife's allegations of gambling, drinking, loafing, and wasting of marital assets on the part of her spouse as early as 1980, but it found these allegations insufficient to signal that the marriage had begun to undergo an irreconcilable breakdown at that time. *Hazel*, 219 Ill. App. 3d at 921-23. The court pointed out that, prior to 1988, the wife had not filed for dissolution and the parties had never physically separated. *Hazel*, 219 Ill. App. 3d at 922. Moreover, the wife testified that despite some marital discord the couple would always reach a point when things would go back the way they had been prior to any altercation and that they continued to engage in sexual relations until the filing of the petition for dissolution in June 1988. *Hazel*, 219 Ill. App. 3d at 922. In short, the *Hazel* court concluded that, while the marriage might not have been a happy one, the trial court's finding that the marriage was not undergoing an irreconcilable breakdown prior to 1988 was not improper. *Hazel*, 219 Ill. App. 3d at 922-23.

¶ 92 In this case, the evidence does not support Cynthia's claim that the trial court attempted to pinpoint a specific date when the breakdown of the parties' marriage was complete, rather than when the process of irreconcilable breakdown began. The trial court cited to *Hazel* to stress that while the Romanos, like most married couples, might have had disputes during the course of their marriage, not every conflict signals that a marriage has begun to undergo an *irreconcilable* breakdown. While the language the trial court used to explain its decision might not have been set forth with complete clarity, we do not interpret its decision to be in conflict with our holding in *Holthaus*. In fact, the trial court expressly acknowledged the *Holthaus* decision by citing to it using the signal "*cf.*" See The Bluebook: A Uniform System of Citation R. 1.2(a), at 55 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010) (noting that the signal "*cf.*" designates that the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support"). Therefore, we do not

find that the trial court applied an improper standard in assessing when the irreconcilable breakdown of the Romano's marriage occurred.

¶ 93    Cynthia also claims that the trial court's usage of the term "irretrievable" rather than "irreconcilable" supports the conclusion that the court was attempting to determine a date certain for the breakdown. However, Cynthia merely creates a distinction without a difference. First, these two terms share similar definitions. As noted above, the term "irreconcilable" is defined as "impossible to bring into friendly accord or understanding: hostile beyond the possibility of reconciliation." Webster's Third New International Dictionary 1195 (2002). The term "irretrievable" has been defined as "not retrievable: impossible to recoup, repair, or overcome." Webster's Third New International Dictionary 1196 (2002). Second, courts have used the two terms interchangeably in discussing dissipation. See *In re Marriage of DeLarco*, 313 Ill. App. 3d 107, 112 (2000) (using the terms "irretrievably" and "irreconcilably" in defining dissipation); *In re Marriage of Toole*, 273 Ill. App. 3d 607, 615 (1995) (same); *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 510 (1993) ("Generally, dissipation involves one spouse's use of marital property for a selfish purpose unrelated to the marriage at a time when the marriage is undergoing an irretrievable breakdown."); *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 984 (1992) ("In the present case, respondent undisputedly withdrew the funds when the marriage was experiencing an irretrievable breakdown."); *In re Marriage of Landwehr*, 225 Ill. App. 3d 149, 151 (1992) ("[N]o evidence was presented establishing any such number of trips was taken after such time as it could be determined the parties' marriage was suffering an irretrievable breakdown.").

¶ 94    Even if we were to interpret the trial court's ruling as applying an improper standard for determining an irreconcilable breakdown, we would be compelled to find any error harmless. See *Holthaus*, 387 Ill. App. 3d at 375-77 (applying harmless-error analysis to irreconcilable-breakdown determination). Here, Cynthia suggests that the parties' marriage began undergoing an irreconcilable breakdown between 2000 and 2003. However, regardless of the standard, the trial court did not find the parties' marriage to be broken down, or even necessarily troubled, in 2000 or 2003.

¶ 95    In particular, we note that the trial court reviewed the evidence presented and determined that it did not support Cynthia's contention that the parties' marriage was undergoing an irreconcilable breakdown in 2000 or 2003. The court recited in its October 12, 2009, letter opinion a list of actions to which Cynthia had testified to demonstrate that the parties' marriage was undergoing an irreconcilable breakdown as far back as 2000 or 2003. The trial court referenced the following testimony from Cynthia: (1) in 2000, after she was diagnosed with breast cancer, Daniel made statements to the effect that he wanted her to die; (2) in 2003, Daniel told her that he was planning a divorce and that he would leave her with nothing; (3) in 2006, Daniel told her that he had had extramarital affairs; (4) Daniel was abusive toward her and the children; (5) Daniel never informed her of the existence of the DMR trusts; (6) while she and Daniel resided in the same house, they slept apart; and (7) Daniel stopped wearing his wedding ring in 2003. The trial court also listed the following actions to which Daniel had testified at trial as demonstrating the health of the parties' marriage: (1) in 2003, Daniel established a life-insurance trust for Cynthia and the children;

-24-

(2) in 2003, Daniel purchased the Indian Trail residence for $1.1 million, and in 2005 he sold the home to Cynthia's parents for $350,000, gifting the remaining value to them; (3) between 2003 and 2006, Daniel paid for improvements to the Indian Trail residence totaling $1.3 to $1.4 million; (4) on December 25, 2004, Daniel gave Cynthia a note expressing his affection for her, accompanied by a "massive" diamond ring; (5) on February 4, 2005, her birthday, Daniel gave Cynthia a note expressing his affection for her; (6) late in 2005, Daniel and Cynthia appeared in public together and held hands; (7) in 2005, Daniel loaned Cynthia's brother $250,000; (8) early in 2006, Daniel and Cynthia took two vacations together; (9) Daniel and Cynthia continued to share a marital bed through early 2006; and (10) Cynthia prepared meals for the family through early 2006. As noted above, after reviewing this evidence, the trial court found Cynthia's testimony less credible than Daniel's testimony. It also noted that Daniel's testimony was "essentially unrebutted." As the trier of fact, the trial court was in a superior position to observe the demeanor of the witnesses, determine and weigh their credibility, and resolve any conflicts in their testimony. *In re Marriage of Rosen*, 126 Ill. App. 3d 766, 774 (1984). Given the disputed evidence, we cannot say that the trial court's finding that Cynthia failed to establish dissipation is against the manifest weight of the evidence. Simply put, neither is a conclusion opposite to that of the trial court clearly apparent nor is the trial court's finding arbitrary, unreasonable, or not based on the evidence. See *Ricketts*, 329 Ill. App. 3d at 181-82.

¶ 96    Cynthia next contends that the trial court's finding is against the manifest weight of the evidence because there is sufficient evidence, independent of her own testimony, to support the conclusion that the parties' marriage was in the process of undergoing an irreconcilable breakdown as far back as 2000. In support of this conclusion, Cynthia cites to the following testimony elicited from Daniel and his witnesses at trial: (1) each year between 2001 and 2004, Daniel told his accountant that Cynthia would not sign a joint tax return; (2) in 2003, Cynthia refused to sign a mortgage on the Indian Trail residence that the couple later sold to Cynthia's parents; (3) in 2004, Daniel purchased the 706 Deer Trail residence, in spite of Fee's advice to the contrary, because Cynthia wanted the house and Daniel did not think he could say no; (4) in 2005, Daniel told his accountant that his life would be "holy hell" if he did not sell the Indian Trail residence to Cynthia's parents at a reduced price; (5) in 2005, Fee advised against selling the Indian Trail residence to Cynthia's parents at a reduced price, describing it as possibly "one of the worst financial decisions that [he has] ever been a part of," but Daniel felt he had to do it to save his marriage; (6) in 2004, Cynthia deposited the couple's $300,000 tax refund in an account in her own name; (7) in 2005, the parties argued about money because Daniel could not control Cynthia's spending; (8) in 2006, Daniel took an AIDS test at Cynthia's insistence; (9) DJ testified that he became aware of difficulties in Cynthia and Daniel's marriage a few years after they were married; and (10) Michael D. was aware that Cynthia and Daniel were having problems before Daniel filed for divorce, as they would often appear at family functions "late and irritated."

¶ 97    However, none of this evidence demonstrates anything other than the fact that the parties had, at times, a contentious marriage. Indeed, DJ described the difficulties he observed as "normal marital problems." DJ also testified that, as recently as a couple of weeks before Daniel left the marital residence in April 2006, Daniel told him that he loved Cynthia.

Similarly, Michael D. acknowledged that, although the couple experienced difficulties "very early on" in the marriage, the problems Daniel generally described to him amounted to "typical marriage-type of complaints." Michael D. added that Daniel never told him that he wanted to divorce Cynthia. Moreover, the trial court was well aware of the testimony cited by Cynthia, yet it still concluded that the evidence was not sufficient to support a finding that the parties' marriage was undergoing an *irreconcilable* breakdown in 2000 or 2003. In fact, it is questionable whether the testimony cited by Cynthia could support such a finding when most of the examples she cites occurred well after that time frame. Because the evidence supports a finding that the parties' marriage was not undergoing an *irreconcilable* breakdown in 2000 or 2003, we find that the trial court's finding on dissipation is not against the manifest weight of the evidence.

¶ 98                          4. Fraud On Cynthia's Marital Rights

¶ 99        Cynthia's final argument relates to a claim she raised at trial, that Daniel's transfer of assets into the DMR trusts and the subsequent transfer of assets out of the DMR trusts to Daniel's siblings constituted a fraud on her marital rights. On October 17, 2008, at the close of Cynthia's case, Daniel made an oral motion for a directed finding on this claim. After both parties argued their respective positions, the trial court granted Daniel's motion, stating, "[w]ith respect to the claim that the entire transaction constitutes a fraud upon [Cynthia's] marital rights, the Court will, in fact, enter a finding that the claim has not been sustained." On appeal, Cynthia contends that this finding is against the manifest weight of the evidence. In particular, Cynthia, relying on *In re Marriage of Frederick*, 218 Ill. App. 3d 533 (1991), asserts that the circumstances surrounding the DMR trusts, when viewed together, establish that the transfers were "illusory and/or colorable" and were made to defeat her marital rights.

¶ 100        In cases tried without a jury, the defendant may move for a directed finding in his or her favor at the close of the plaintiff's case. 735 ILCS 5/2-1110 (West 2008); *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849, ¶ 39. In ruling on a motion for a directed finding, the trial court must engage in a two-step analysis. *Buechin v. Ogden Chrysler-Plymouth, Inc.*, 159 Ill. App. 3d 237, 246 (1987). First, the court must determine as a matter of law whether the plaintiff has presented a *prima facie* case. *Law Offices of Colleen M. McLaughlin*, 2011 IL App (1st) 101849, ¶ 39. A plaintiff presents a *prima facie* case where he or she presents some evidence on each element essential to the cause of action. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). Second, if the plaintiff has presented some evidence on each element, the court then must consider and weigh the totality of the evidence presented, including evidence that is favorable to the defendant. *Law Offices of Colleen M. McLaughlin*, 2011 IL App (1st) 101849, ¶ 39. If the trial court finds that the plaintiff has failed to establish a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. *Minch*, 395 Ill. App. 3d at 398. However, if the trial court moves on to consider the weight and quality of the evidence and finds that no *prima facie* case remains, the appellate standard of review is the deferential manifest-weight-of-the-evidence standard. *Gorski v. Board of Fire & Police Commissioners*, 2011 IL App (2d) 100808, ¶ 34. As noted elsewhere, a decision is against the manifest weight of the evidence if the opposite conclusion is clearly apparent. *Gorski*, 2011 IL App (2d) 100808, ¶ 34.

¶ 101    According to Cynthia, it was improper for the trial court to grant Daniel's motion for a directed finding, because one of her witnesses, Tarshis, testified that the DMR trusts "contained certain ties or connections which demonstrated that [Daniel] had retained sufficient control of the trusts to make the transfer of assets illusory and/or colorable." Thus, she maintains that the assets of the DMR trusts should not be segregated from Daniel's personal assets.[5] Cynthia cites the following "ties or connections" as support for her claim that Daniel's transfers of the assets were " 'illusory' and/or 'colorable' and, therefore, a fraud on [her] marital rights": (1) Daniel could obtain unsecured loans from the trusts; (2) Daniel had the power to control the investment of trust assets, including the ability to "freely withdraw trust assets and substitute assets"; (3) Fee, the asset manager of the trusts, testified that he obtained Daniel's approval to transfer $8 million to Daniel's siblings without consideration, and Tarshis testified that each sibling had over the trusts a power of appointment that would allow these funds to recirculate back to Daniel; (4) Daniel's brother Victor had with regard to the DMR trusts a power of appointment that was not subject to fiduciary standards; (5) Buddy, the trustee of the trusts, testified that he would "do what Daniel asked him to do with regard to the trusts"; (6) Daniel transferred more than $2 million from his personal brokerage accounts to college savings accounts established for his siblings' children; (7) Buddy testified that he would sign whatever Fee wanted him to sign; and (8) Daniel was named as a beneficiary of Buddy's trusts in exchange for placing his assets in the DMR trusts. Cynthia further claims that she had no knowledge of the foregoing until after the dissolution action was filed and discovery commenced.

¶ 102    At the outset, we point out that it is not entirely clear from the record whether Daniel's motion for a directed finding was granted based on the first or the second step of the analysis set forth above. However, Cynthia advocates application of the manifest-weight-of-the-evidence standard. Daniel does not argue otherwise. Accordingly, we will presume that the trial court found that Cynthia presented some evidence on each element essential to her claim of fraud on her marital rights, but that, after considering and weighing the totality of the evidence presented during her case in chief, it found that no *prima facie* case remained. We also point out that, although Cynthia is challenging the ruling the trial court made *at the close of her case*, some of the evidence she cites above was presented during Daniel's case in chief. Thus, it was not considered by the trial court when it ruled on Daniel's motion for a directed finding. See *Friedman v. Safe Security Services, Inc.*, 328 Ill. App. 3d 37, 50-51 (2002) (and cases cited therein) (noting that, on a defendant's motion for a directed finding, only the plaintiff's evidence may be considered and the evidence must have been actually introduced at trial). Indeed, the standards applied when deciding substantive issues at the close of the entire case differ from the standards applied when ruling on a motion for a directed finding at the close of the plaintiff's case. *In re Marriage of Shaner*, 252 Ill. App. 3d 146, 163 (1993). Accordingly, in assessing the propriety of the trial court's ruling on Daniel's motion for a directed finding, we will confine our analysis to evidence presented

[5]Cynthia's position seems to ignore the fact that, while the trial court ruled that the DMR Gift Trust and the MP Trust were neither part of the marital estate nor Daniel's nonmarital property, the court did classify the SP Trust as marital property, which it assigned to Daniel.

during Cynthia's case in chief, which centered on the testimony of Tarshis.

¶ 103     In Illinois, an owner has an absolute right to dispose of his property during his lifetime in any manner he sees fit, and he may do so even though the transfer is for the precise purpose of defeating his spouse's statutory marital interests in the property conveyed. *Johnson v. La Grange State Bank*, 73 Ill. 2d 342, 357 (1978). As such, a transfer is not vulnerable to attack by a spouse unless the transaction "is a sham and is 'colorable' or 'illusory' and is tantamount to a fraud." *Johnson*, 73 Ill. 2d at 358 (quoting *Holmes v. Mims*, 1 Ill. 2d 274, 275 (1953)).[6] An "illusory" transfer is one "which takes back all that it gives." *Johnson*, 73 Ill. 2d at 359. A "colorable" transfer is one "which appears absolute on its face but due to some secret or tacit understanding between the transferor and the transferee the transfer is, in fact, not a transfer because the parties intended that ownership be retained by the transferor." *Johnson*, 73 Ill. 2d at 359. In other words, although a spouse's marital rights can be defeated by an actual transfer, a purported transfer whereby the owner does not intend to convey a present interest, but intends to retain ownership, is evidence of an intent to defraud. *Johnson*, 73 Ill. 2d at 359-60; see also *Demos v. Demos*, 8 Ill. App. 3d 906, 908 (1972).

¶ 104     In her case in chief, Cynthia presented the testimony of Tarshis in support of her claim of fraud on her marital rights. Tarshis testified that he is an attorney who specializes in trusts and estates and creditor protection. On direct examination, Tarshis explained that trusts can be established with "ties" that permit the settlor of the trust to maintain some control over the assets transferred therein. Tarshis testified that, if the settlor has too many "ties" to the trust, there is a risk that the transfer will not "hold up" and would be classified as "elusory [*sic*]." After reviewing various documents, including the DMR trusts, trusts established by other members of the Romano family, and transactions between the DMR trusts and members of the Romano family, Tarshis testified that he found six "ties" between Daniel and the DMR trusts: (1) Daniel's status as a "permissible beneficiary" of the SP Trust; (2) Daniel's ability to obtain an unsecured loan from any of the trusts; (3) Daniel's ability to substitute assets within the trusts with assets outside of the trusts; (4) Victor's power of appointment over the trusts, which is not subject to any fiduciary standards and which permits Victor to name Daniel as a "permissible appointee"; (5) a power of attorney held by Daniel over various investment accounts established on behalf of the trusts; and (6) a trustee (Buddy) who is a family member.

¶ 105     Tarshis elaborated on some of these "ties." For instance, Tarshis testified that Victor's power of appointment allows him to "override the provisions of the trust and distribute the trust funds to anyone within the Romano family other than [Victor] himself." As a result, Victor could transfer any trust funds back to Daniel. Tarshis also testified that Daniel took a loan from the SP Trust in May 2004 for $1.3 million, ostensibly secured by a mortgage.

---

[6]While *Johnson* dealt with an *inter vivos* transfer of property in relation to the rights of a surviving spouse, the same test may be properly applied with respect to dissolution proceedings. See *Hofmann v. Hofmann*, 94 Ill. 2d 205, 231 (1983) (Ryan, C.J., concurring in part and dissenting in part).

However, Tarshis did not believe that the mortgage was valid, noting that, to the best of his knowledge, Daniel has not made any payments on the loan. Tarshis testified that the power of attorney Daniel held over the investment accounts established on behalf of the trusts allowed Daniel to make investment decisions with respect to those accounts. Based on the "pervasive ties between [Daniel] and the trusts," Tarshis did not believe that the assets of the trusts should be segregated from Daniel's personal assets.

¶ 106    On cross-examination, Tarshis acknowledged that he does not practice matrimonial law or possess expertise in that field, but he stated that he knows "the general lay of the land" regarding the classification of assets. He also acknowledged that he is not an expert as to what constitutes "control" over assets for purposes of matrimonial law. Tarshis testified that he prepared a memorandum that discussed the applicability of the Uniform Fraudulent Transfer Act (Transfer Act) (740 ILCS 160/1 *et seq*. (West 2008)) to this case. He later admitted that no claim under the Transfer Act had been asserted in this case and that the Transfer Act would not preempt any existing common-law fraud claim. When Tarshis was asked whether Illinois recognizes a common-law fraud claim against marital rights, he responded that he is "not a matrimonial law expert." He acknowledged that a claim of fraud against marital rights was made in this case, but stated that he was not aware of the elements of such a claim.

¶ 107    Tarshis further testified on cross-examination that he based his statement that Daniel is a beneficiary of the SP Trust on his reading of the beneficiary section of that trust. Tarshis acknowledged that under the DMR Gift Trust and the MP Trust, both of which were established on the same day as the SP Trust, Daniel is excluded as a beneficiary. After reviewing the beneficiary sections of all three trusts, Tarshis acknowledged that the wording of the beneficiary section of the SP Trust, which does not expressly exclude Daniel as a beneficiary, could be an error. In fact, Tarshis acknowledged that the drafter of the SP Trust (Hartz) filed an affidavit stating that the beneficiary section contained an error. Tarshis added that, if he were drafting a trust for which he desired to exclude the corpus from the estate of the settlor, he would probably not make the settlor a beneficiary of the trust. Tarshis testified that, to the best of his knowledge, Daniel had not received any distributions from the SP Trust as a beneficiary.

¶ 108    Tarshis noted that, when the DMR trusts were created in 2001, they were drafted as grantor trusts. He also noted that the other trusts established by members of the Romano family at the same time were grantor trusts at the time of their creation. In fact, Tarshis acknowledged that a GRAT, one type of trust used by the Romano family, is a "common vehicle" to help shield from taxation the proceeds of a sale of a closely held business. Tarshis stated that the GRATs at issue, the MP Trust and the SP Trust, had that effect here. Moreover, Tarshis acknowledged that the Internal Revenue Code allows a grantor to pay the taxes on the income generated by the trust without incurring gift taxation. In fact, Tarshis testified that Daniel, as the grantor of the three DMR trusts, was required by the terms of the DMR trusts to pay taxes on the income generated by the trusts. Tarshis acknowledged that Daniel paid these taxes.

¶ 109    Tarshis next testified about three of the additional "ties" he identified: (1) a trustee who is a family member; (2) Daniel's ability to substitute assets within the trusts with assets

outside of the trusts; and (3) Daniel's ability to obtain unsecured loans from the trusts. Tarshis admitted that each of these "ties" is enumerated as a feature of a grantor trust in the pertinent sections of the Internal Revenue Code. Further, Tarshis acknowledged that all of the Romano family trusts that he reviewed have trustees who are family members of the grantors and that they provide for the grantors to obtain unsecured loans. Tarshis was unable to confirm whether the trusts established by the other members of the Romano family allow for the substitution of assets, because he "didn't look for that provision."

¶ 110    With respect to Victor's power of appointment over the DMR trusts, Tarshis testified that there are also similar powers of appointment in the other trusts created for the members of the Romano family, that these powers are held in all cases by relatives of the grantors, and that the grantors are permissible appointees of the power. Tarshis stated that, to the best of his knowledge, Victor has never exercised the power of appointment in favor of Daniel.

¶ 111    Tarshis testified that the power of attorney held by Daniel over various investment accounts established on behalf of the trusts "came into existence" in May 2006, or about five years after the creation of the trusts. Tarshis was not aware whether this power of attorney was contemplated when the trusts were created, whether Daniel ever exercised this power, or what the purpose was in executing it. Tarshis also admitted that the power does not allow Daniel the right to remove any assets from the trusts. However, Tarshis stated that, because the power gave Daniel the ability to direct investments in the trust, it constitutes a "tie."

¶ 112    Tarshis testified that Cynthia is a named beneficiary in all of the trusts created by Daniel in 2001 despite the fact that there was no requirement that Daniel name Cynthia as a beneficiary of those trusts. Tarshis could not explain why a settlor who purportedly wanted to shield assets from his spouse would nonetheless include her as a beneficiary of his trusts. In fact, Tarshis testified that, if he were creating a trust for the purpose of shielding assets, he would not create it with as many "ties" as he identified in the DMR trusts.

¶ 113    On redirect examination, Tarshis testified that Cynthia's beneficial interests in the DMR trusts terminate if her marriage to Daniel is dissolved. Tarshis also stated that as of 2006, when he received the SP Trust document, Daniel remained within the category of permissible beneficiaries of the trust and there had not been any court document tendered to him reflecting that such designation was the result of a scrivener's error, as suggested by Daniel.

¶ 114    The trial court considered the weight and quality of the foregoing evidence, including that which was favorable to Daniel, and determined that no *prima facie* case of fraud on Cynthia's marital rights remained. We cannot say that this finding is against the manifest weight of the evidence. Although Tarshis identified six "ties" that he alleged rendered the DMR trusts illusory, the trial court was not required to adopt his opinion in light of his acknowledgments that, *inter alia*: (1) he applied the factors in the Transfer Act to determine if a fraudulent transfer occurred, instead of authority pertaining to common-law fraud on marital rights; (2) he would "possibly" advise his clients to create trusts to help shield assets from taxation if they were selling a closely held business; (3) the designation of Daniel as a permissible beneficiary of the SP Trust could have been an error; (4) three of the six alleged "ties" were enumerated as features of a grantor trust in the Internal Revenue Code; (5) the other Romano family trusts share some of the same characteristics; (6) Daniel's power of

attorney over the brokerage accounts did not come into existence until five years after the trusts were created; (7) he was not aware if the power of attorney was ever exercised; (8) Cynthia is a named beneficiary in each of the DMR trusts; and (9) he would not have created trusts with that many "ties" if he were creating them for the express purpose of shielding assets.

¶ 115    Finally, we note Cynthia's reliance on *Frederick*, 218 Ill. App. 3d 533, to support her claim that the circumstances surrounding the creation of the DMR trusts demonstrate that they were created with the intent to defeat her marital rights. At the outset, we point out that *Frederick* did not involve a directed finding at the close of the plaintiff's case. Moreover, *Frederick* is factually distinguishable. The *Frederick* court found that the husband's transfer of marital property into a revocable trust was illusory and that the trust was created for the sole purpose of defeating the wife's marital rights to the property. *Frederick*, 218 Ill. App. 3d at 539. The facts in *Frederick* show that on August 27, 1987, a few months before the husband filed for divorce, he executed a will that would have "poured" real property located in Maine into trusts established for the wife and the parties' children. *Frederick*, 218 Ill. App. 3d at 537. One day later, on August 28, 1987, the husband hired an attorney–the same attorney who later represented him in the dissolution proceedings–to establish an estate plan. *Frederick*, 218 Ill. App. 3d at 537-38. As part of this plan, the Maine property was placed into a revocable trust (the Maine Trust) with the husband as the settlor and the trustee. *Frederick*, 218 Ill. App. 3d at 535. Under the terms of the Maine Trust, the children would receive an interest in the Maine property, but the wife would not. *Frederick*, 218 Ill. App. 3d at 537-38. The husband testified that he altered the manner in which the Maine property was to be distributed because he wanted to be certain that his children received the property. *Frederick*, 218 Ill. App. 3d at 537. The husband expressed concern about his children's interest because of conduct by the wife toward the children in the early-to-mid-eighties and her alleged alcohol abuse. *Frederick*, 218 Ill. App. 3d at 537. However, the evidence indicated that he was aware of these facts in August 1987, when he initially provided for the Maine property. *Frederick*, 218 Ill. App. 3d at 537.

¶ 116    In association with the creation of the Maine Trust, the husband's attorney sent the husband a letter, which enclosed an agreement for the wife's signature. *Frederick*, 218 Ill. App. 3d at 535. This agreement included, *inter alia*, an acknowledgment that the Maine property was being conveyed to a revocable trust for the primary benefit of the parties' two children and that the Maine property would not be treated as marital property under the Act. *Frederick*, 218 Ill. App. 3d at 535. The cover letter to the agreement referenced that the Maine property would be excluded from marital property "at the divorce" and stated that, "if the divorce proceedings become acrimonious," the wife could attempt to set aside the agreement. (Emphasis omitted.) (Internal quotation marks omitted.) *Frederick*, 218 Ill. App. 3d at 538. Further, when the husband presented the wife with the agreement, he told her that "if there was ever a problem with the marriage, *i.e.*, divorce, 'one or the other' could challenge the trust and 'somebody' could take back what they had already given." *Frederick*, 218 Ill. App. 3d at 538. The husband also told the wife that her signing the agreement would protect the Maine Trust. *Frederick*, 218 Ill. App. 3d at 538.

¶ 117    The court found that the husband misrepresented the true nature of the agreement, as it

was clearly designed to protect the Maine Trust from any claim by the wife during a divorce and was prepared against the backdrop of imminent divorce proceedings. *Frederick*, 218 Ill. App. 3d at 538-39. The court reasoned that, based on the timing of the creation of the Maine Trust in relation to the commencement of divorce proceedings and the language contained in the cover letter from his attorney, it was evident that the husband was contemplating divorce at the time of the creation of the Maine Trust. *Frederick*, 218 Ill. App. 3d at 539.

¶ 118    The present case is factually distinguishable from *Frederick*. The DMR trusts were not created proximate to Daniel's contemplating a divorce. Indeed, the creation of the estate plan predated the divorce filing by five years, and there is no indication that, when Daniel discussed the estate plan with his attorney, he inquired regarding the ramifications of a divorce on the estate plan. Further, in contrast to the husband in *Frederick*, there is no evidence that Daniel made any misrepresentations to Cynthia about his family's estate plan or that he forced her to enter into any type of agreement regarding the allocation of the parties' assets upon divorce. Accordingly, Cynthia's reliance on *Frederick* is misplaced.

¶ 119                                    B. Daniel's Arguments
¶ 120                                1. Division of Marital Property
¶ 121    In his appeal, Daniel first claims that the trial court's division of marital property was inequitable. Section 503(d) of the Act (750 ILCS 5/503(d) (West 2008)) requires the trial court to divide marital property in "just proportions," considering the 12 relevant factors set forth therein. The statutory factors include:

"(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including *** the contribution of a spouse as a homemaker or to the family unit;

(2) the dissipation by each party of the marital or non-marital property;

(3) the value of the property assigned to each spouse;

(4) the duration of the marriage;

(5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

(6) any obligations and rights arising from a prior marriage of either party;

(7) any antenuptial agreement of the parties;

(8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

(9) the custodial provisions for any children;

(10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d)(1) to (d)(12) (West 2008).

The touchstone of proper apportionment is whether it is equitable, and each case rests on its own facts. *In re Marriage of Bentivenga*, 109 Ill. App. 3d 967, 971 (1982). An equitable division does not necessarily mean an equal division, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result. *Henke*, 313 Ill. App. 3d at 175. "A reviewing court applies the manifest weight of the evidence standard to the factual findings of each factor on which a trial court may base its property disposition, but it applies the abuse of discretion standard in reviewing the trial court's final property disposition ***." *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005). A trial court abuses its discretion only where no reasonable person would have distributed the property as the trial court did. *Henke*, 313 Ill. App. 3d at 175.

¶ 122    Daniel notes that the trial court awarded approximately 23% of the marital estate to him, while it awarded approximately 77% of the marital estate to Cynthia. Daniel asserts that this allocation constituted an abuse of discretion when considered in light of the factors set forth in section 503(d) of the Act. In particular, Daniel focuses on the following in support of his claim. First, Daniel complains that approximately $6 million was depleted from his individual brokerage accounts to pay for family expenses. Second, Daniel complains that he was assigned a $1.3 million debt while the asset to which the debt was attached–the 706 Deer Trail residence–was assigned to Cynthia. Daniel asserts that this debt is almost equal to the entire value of the marital assets that he received under the judgment of dissolution. Third, Daniel stresses his contributions to the acquisition and preservation of the parties' marital estate, noting that he was the sole income producer since the birth of the parties' first child.

¶ 123    In its October 12, 2009, letter opinion, the trial court acknowledged that the division of property was "grossly disparate." Regarding Daniel's first point, however, the trial court found that Daniel was "to a great extent" responsible for creating the parties' lavish lifestyle. The court noted that, while the lifestyle cannot continue, Cynthia and Alexander should not experience a "drastic and immediate change" while Daniel, albeit through the largesse of his family, lives with little apparent diminution of lifestyle. Regarding Daniel's second point, the court explained that it allocated the $1.3 million debt on the 706 Deer Trial residence to Daniel, while allocating the residence to Cynthia, on the basis that the mortgage debt was "illusory." In this regard, the court noted that Daniel "had the ability to receive a mortgage from the SP trust, and never make a payment on that mortgage." Further, the court noted that the mortgage was never recorded, and to the extent that the debt is valid, it is owed to the SP Trust, which the court awarded to Daniel. As such, the court noted, Daniel is the individual entitled to the mortgage proceeds, and he can opt to pay himself or choose not to do so with no consequences.

¶ 124    With respect to Daniel's third point, Daniel emphasizes his financial contribution to the marriage while virtually ignoring Cynthia's role as a homemaker. Further, while the trial court did allocate more of the net marital assets to Cynthia, Daniel had significant nonmarital assets, including the Lake Shore Drive condominium valued at $1.6 million and his interests in the remaining family businesses, M&D and Power. With respect to the latter, although Daniel's interests in M&D and Power were not valued, the trial court believed that Daniel's interests in the companies will be valuable to Daniel in the future. Indeed, the evidence establishes that Daniel has a superior earning capacity, has more sources of income, and has

-33-

a greater opportunity for future acquisition of capital assets and income as compared to Cynthia. In this regard, we note that Daniel, who was 54 years old as of the date of dissolution, is apparently in good health. He has a bachelor's degree in liberal arts and a master's degree in business administration. Further, he is employed under a 10-year contract signed with SWSI in 2002, earning a base salary of $550,000 plus bonuses. The trial court also pointed out that Daniel is the "manager" of Power, a distributor of Red Bull energy drink. In contrast, during the marriage, Cynthia suffered from breast cancer and underwent a mastectomy. Further, although Cynthia has degrees in nursing and psychology, she has not worked outside of the home since the birth of the parties' first child in 1988. Cynthia, who was 56 years old at the time of the dissolution, testified that her nursing license has lapsed and that she would have to go back to school to get relicensed. Given these circumstances, and in light of the factors set forth in section 503(d) of the Act, we cannot say that the trial court abused its discretion in distributing the marital assets.

¶ 125                              2. Maintenance as Substitute for Child Support

¶ 126    Daniel next contends that the trial court improperly substituted a maintenance award for a child support award. In its October 12, 2009, letter opinion, the trial court noted that the only unemancipated child lived with Cynthia under a joint parenting agreement. The trial court fixed child support at $6,000 per month, which it calculated as 20% of Daniel's net base salary at SWSI. In addition, the court awarded Cynthia periodic modifiable maintenance in the amount of $6,000 per month, subject to termination on statutory grounds. The court also provided that Daniel pay child support of "20% of any actual income over $550,000 per year" and additional maintenance of "20% of his net over an amount calculated based upon a gross income of $550,000." Subsequently, in its December 12, 2009, letter opinion, the court *sua sponte* reconsidered its award of maintenance and child support. The court explained as follows:

"The unintended consequence of the award is to suggest that at Alexander's emancipation only the maintenance should continue. Based upon the length of the marriage and the earning capacity of each party, the court will award Cynthia with periodic maintenance of $15,000 per month and sets [*sic*] child support at zero. [Daniel] will pay additional maintenance in the amount of 40% of any income over $550,000 per year. The downward deviation on child support is approved based upon the amount of maintenance Cynthia will receive and the assets set aside for her. Should the maintenance terminate while Alexander remains unemancipated then child support will be set at the then-existing guidelines or any deviation a court deems appropriate."

¶ 127    Daniel contends that, in classifying his entire support obligation as maintenance, the trial court was improperly substituting maintenance for child support. Citing *In re Marriage of Scafuri*, 203 Ill. App. 3d 385, 392-93 (1990), Daniel notes that while child support and maintenance are related, they have distinctly different purposes and one should not be substituted for the other. Daniel further asserts that the effect of the court's substitution of his child support obligation with an increased maintenance obligation operates to deprive him of his right to modification of support upon Alexander's emancipation, as permitted

-34-

under section 505 of the Act (750 ILCS 5/505 (West 2008)). Daniel acknowledges that the maintenance award is modifiable. However, he contends that he will be required to show a substantial change in circumstances in order to modify the award, and a child's emancipation would not be considered a substantial change in circumstances for purposes of modifying maintenance. Cynthia responds that the trial court's order constitutes unallocated support, which benefits Daniel because it will permit him to deduct the full amount of his payment on his federal income taxes. See *In re Marriage of Belluomini*, 104 Ill. App. 3d 301, 307-08 (1982). As such, Cynthia claims that no error occurred. We agree with Daniel.

¶ 128    Although an award of unallocated maintenance and child support, attendant with any federal income tax benefits, may be made under the Act (see *Belluomini*, 104 Ill. App. 3d at 307-08), we conclude that the trial court's maintenance order in this case did not constitute an unallocated award. As set forth above, the trial court's addendum to the judgment of dissolution awards Cynthia periodic maintenance of $15,000 and expressly sets child support at *zero* dollars per month. Further, if the child support order were truly an unallocated award, Daniel would be able to seek a modification of the support order upon the child's emancipation. See 750 ILCS 5/510(a) (West 2008) (providing for modification of child support upon a showing of a substantial change in circumstances); *In re Marriage of Gleason*, 266 Ill. App. 3d 467, 468 (1994) (holding that the unallocated combination of child support and maintenance necessarily carries with it the statutory right to modification of child support); see also 750 ILCS 5/505(g), 510(d) (West 2008) (providing for termination of child support upon emancipation). Here, the trial court stated in its December 12, 2009, letter opinion that it was reconsidering the awards of maintenance and child support because "[t]he unintended consequence of the award is to suggest that at Alexander's emancipation only the maintenance award should continue." In other words, the trial court did not intend Alexander's emancipation to have any effect on Cynthia's maintenance award, and any attempt by Daniel to seek modification upon Alexander's emancipation would be futile. Since the award crafted by the trial court contravenes the statutory right to modify child support (see *Gleason*, 266 Ill. App. 3d at 468), it cannot be considered unallocated support. As such, we vacate the award and remand the matter to the trial court for a determination of the proper amounts of maintenance and child support.

¶ 129                                    3. Maintenance

¶ 130    Daniel also argues that the amount of maintenance awarded to Cynthia is excessive. Given our decision to remand the cause for a determination of the proper amounts of maintenance and child support, we need not address this issue.

¶ 131                                    4. Attorney Fees

¶ 132    Daniel's final argument on appeal is that the trial court did not account for the predistribution of assets to Cynthia for attorney fees. In particular, Daniel references a distribution for attorney fees from the liquidation of the "Pabrai" investment account, made pursuant to an order entered on October 6, 2009. According to Daniel, he established at trial that Pabrai was his nonmarital property. Therefore, he asserts, he was entitled to

consideration for its use by Cynthia. We find no error.

¶ 133    The record establishes that on October 6, 2009, the trial court entered an agreed order, in which Daniel and Cynthia were each granted $255,000 to be used for the payment of interim attorney fees. The order required the liquidation of the investment in Pabrai for the purpose of funding the payment of the fees and mandated that the disbursement from Pabrai be treated as a distribution from each party's ultimate share of the marital estate. In its October 12, 2009, letter opinion, the trial court referenced the liquidation of Pabrai and noted that the fees in the case were "astronomical." Ultimately, the court held that each party would be responsible for his or her own fees, given the "grossly disparate division of property and the payments already authorized by the court."

¶ 134    Thereafter, Daniel filed a motion to clarify the judgment and update values. In his motion, Daniel requested that the trial court amend its judgment to apply a credit for the $255,000 predistribution to Cynthia's share of the marital estate. In its December 12, 2009, letter opinion, the trial court held that, even after consideration of the predistribution, the balance of the asset distribution remained "within the range of the reasonable, especially considering the update [*sic*] balance of the HELOC [home equity line of credit]." The HELOC referenced by the trial court in its December 12, 2009, letter was an encumbrance against the marital residence, which was awarded to Cynthia. The parties stipulated that the value of the marital residence was $3 million, exclusive of any liens. In the judgment of dissolution entered on November 7, 2009, the balance of the HELOC was listed as $534,000. Thus, the net value of the marital residence was $2,466,000. However, after the parties filed their posttrial motions, the trial court issued its addendum to the judgment of dissolution, updating the balance of the HELOC to $618,000. The effect of this change was to decrease the net value of the marital residence by $84,000. Accordingly, contrary to Daniel's contention, the trial court did consider the predistribution from the liquidation of Pabrai. As such, we find no basis for his claim to the contrary.

¶ 135                                      V. CONCLUSION

¶ 136    For the reasons set forth above, we vacate that portion of the judgment of the circuit court of Du Page County awarding Cynthia maintenance of $15,000 per month. The cause is remanded for further proceedings on that issue as detailed above. In all other respects, we affirm.

¶ 137    Affirmed in part and vacated in part; cause remanded.